Vivienne **RABIDUE**, Plaintiff-Appellant,

v.

**OSCEOLA REFINING COMPANY, A DIVISION OF TEXAS–AMERICAN PETROCHEMICALS, INC.,** Defendant-Appellee.

No. 84–1362.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 25, 1985.

Decided Nov. 13, 1986.

Barbara A. Klimaszewski (argued), William T. Street, Lead Counsel, Saginaw, Mich., for plaintiff-appellant.

Seth Lloyd (argued), Fred Woodworth, Dykema, Gossett, Spencer, Goodnow and Trigg, Detroit, Mich., M. Beth Sax, for defendant-appellee.

Before KEITH, KRUPANSKY and MILBURN, Circuit Judges.

KRUPANSKY, Circuit Judge.

The plaintiff Vivienne Rabidue (plaintiff or Rabidue) timely appealed the district court's judgment in favor of defendant Osceola Refining Co. (Osceola), a division of Texas-American Petrochemicals, Inc. (defendant or Texas-American), after a bench trial on plaintiff's charges of sex discrimination and sexual harassment. In her complaint, the plaintiff asserted charges of sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Michigan's Elliott-Larsen Act, Mich.Comp.Laws Ann. § 37.2101 *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). A memorandum opinion and judgment of the district court concluded that: (1) the defendant Texas-American, a successor corporation, was not liable for any preacquisition sex discrimination; (2) evidence of the plaintiff's hostile personality, willful rudeness, and disregard for company policies satisfied the burden of proof placed upon the defendant to articulate nondiscriminatory reasons in support of her discharge; (3) the plaintiff failed to produce evidence in support of her charge that the defendant's articulated nondiscriminatory reasons for discharge were pretextual; (4) a male employee's language and sexual poster displays constituted "verbal conduct of a sexual nature" within the meaning of the sexual harassment guidelines promulgated by the Equal Employment Opportunity Commission (EEOC); (5) the language and posters did not create an environment of harassment necessary to support a charge of sexual harassment; (6) the plaintiff failed to establish sexual harassment under Michigan's Elliott-Larsen Act; and (7) the plaintiff failed to establish Equal Pay Act violations. *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419 (E.D.Mich.1984).

A review of the record disclosed that the plaintiff entered the employ of Osceola during December of 1970, at which time Osceola was an independently owned company. In 1974, United Refineries of Warren, Ohio acquired Osceola and operated it as a separate division. On September 1, 1976, Osceola was acquired by Texas-American, which corporation is the defendant in this lawsuit.

The plaintiff initially occupied the job classification of executive secretary. In that position, she performed a variety of duties, which included attending the telephone, typing, and a limited amount of bookkeeping. In 1973, the plaintiff was promoted to the position of administrative assistant and became a salaried rather than hourly employee. Her new position enti-

tled her to a longer lunch hour, more liberal vacation allowances, together with various other benefits. In her position of administrative assistant, the plaintiff was responsible for, among other duties, purchasing office supplies, monitoring and/or distributing incoming governmental regulations, and contacting customers. Subsequently, she was assigned additional duties as credit manager and office manager. Included in the plaintiff's new responsibilities was the authority to assign work to a number of other Osceola employees.

The plaintiff was a capable, independent, ambitious, aggressive, intractable, and opinionated individual. The plaintiff's supervisors and co-employees with whom plaintiff interacted almost uniformly found her to be an abrasive, rude, antagonistic, extremely willful, uncooperative, and irascible personality. She consistently argued with co-workers and company customers in defiance of supervisory direction and jeopardized Osceola's business relationships with major oil companies. She disregarded supervisory instruction and company policy whenever such direction conflicted with her personal reasoning and conclusions. In sum, the plaintiff was a troublesome employee.

The plaintiff's charged sexual harassment arose primarily as a result of her unfortunate acrimonious working relationship with Douglas Henry (Henry). Henry was a supervisor of the company's key punch and computer section. Occasionally, the plaintiff's duties required coordination with Henry's department and personnel, although Henry exercised no supervisory authority over the plaintiff nor the plaintiff over him. Henry was an extremely vulgar and crude individual who customarily made obscene comments about women generally, and, on occasion, directed such obscenities to the plaintiff. Management was aware of Henry's vulgarity, but had been unsuccessful in curbing his offensive personality traits during the time encompassed by this controversy. The plaintiff and Henry, on the occasions when their duties exposed them to each other, were constantly in a confrontation posture. The plaintiff, as

well as other female employees, were annoyed by Henry's vulgarity. In addition to Henry's obscenities, other male employees from time to time displayed pictures of nude or scantily clad women in their offices and/or work areas, to which the plaintiff and other women employees were exposed.

The plaintiff was formally discharged from her employment at the company on January 14, 1977 as a result of her many job-related problems, including her irascible and opinionated personality and her inability to work harmoniously with co-workers and customers. The immediate incidents that precipitated the plaintiff's termination included a heated argument with Charles Shoemaker (Shoemaker), the vice-president of Osceola, concerning the implementation of certain accounting practices and procedures by the company and a subsequent, vitriolic confrontation with Robert Fitzsimmons (Fitzsimmons), the vice-president of United Refineries, one of Osceola's major customers, concerning pricing schedules that existed between the companies. The latter incident proved to be highly embarrassing to Shoemaker, especially since the plaintiff intruded into his office while he was meeting with Fitzsimmons. A male employee assumed the plaintiff's former duties as administrative assistant.

Subsequent to her discharge, the plaintiff applied for unemployment benefits with the appropriate state agency, payment of which the company opposed. The plaintiff also timely filed charges of discrimination against her former employer with the EEOC and thereafter commenced the instant action in the district court. At the conclusion of a five-day bench trial which involved the testimony of several witnesses and numerous exhibits, the trial court entered its findings of fact and conclusions of law. *See Rabidue*, 584 F.Supp. 419.

The plaintiff assigned several errors to the trial court's findings of fact and conclusions of law. Mindful of its responsibilities, this court, at the outset, notes that the district court's factual findings are subject to a clearly erroneous standard of

review. Federal Rule 52 provides: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a). A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This standard does not permit a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. *Anderson*, 105 S.Ct. at 1511. Where there are two permissible views of the evidence, the interpretation assigned by the fact-finder must be adopted. *Id.* at 1512. Rule 52 demands even greater deference to the trial court's findings where they are based on credibility determinations. *Id.*

Initially, this court's attention is directed to the defendant Texas-American's asserted successorship defense. It argued that since it did not acquire Osceola until September 1, 1976, it could not be held liable for Osceola's alleged discrimination which occurred prior to that acquisition date. The issue of the defendant's liability as a successor is disposed of by this circuit's pronouncements in *Wiggins v. Spector Freight System, Inc.* 583 F.2d 882 (6th Cir.1978). In *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974), which predated *Wiggins* by approximately four years, this circuit enunciated nine criteria to be applied in evaluating successor liability for purposes of Title VII. The *MacMillan* court directed balancing of the following factors: (1) notice of the charged discrimination by the successor or lack thereof; (2) the ability of the predecessor to provide relief; (3) whether there had been a substantial continuity of business

operations; (4) whether the new employer continued to utilize the same plant; (5) whether the successor continued to employ substantially the same work force; (6) whether the new employer continued to use substantially the same supervisory personnel; (7) whether the same jobs remained in existence under substantially the same conditions; (8) whether the employer continued to use the same machinery, equipment, and methods of production; and (9) whether the successor continued to produce the same products. *Id.* at 1094. *See generally* 1 Larson, Employment Discrimination § 5.33 (1985); Annot., 67 A.L.R. Fed. 806 (1984 & Supp.1985).

In its subsequent decision in *Wiggins*, this circuit reaffirmed the balancing test of *MacMillan* with the caveat that upon a factual finding that (1) charges of discrimination had not been filed with the EEOC at or before the time of acquisition, and (2) the successor had no notice of contingent charges of discrimination at or before the time of acquisition, the case was removed from the rationale of *MacMillan* and successor liability would not attach, thus relieving the trial court from applying the balancing test mandated by *MacMillan*. *Wiggins*, 583 F.2d at 886. Accordingly, this court, having reviewed the record, concludes that the findings of the district court, that (1) there were no charges of discrimination filed or pending before the EEOC at or before the time of Osceola's acquisition by Texas-American, and (2) that Texas-American was unaware of any outstanding or contingent charges of discrimination at or before its acquisition of Osceola, were not clearly erroneous. The district court's disposition of the successorship issue, when considered in the context of the pronouncements of *Wiggins*, was therefore correct. The district court's conclusion that Texas-American was not legally responsible for any claims of unlawful sex discrimination or sexual harassment prior to its acquisition of Osceola is AFFIRMED.[1]

1. This court observes that the district court did not premise its judgment in favor of the defend-

■ The plaintiff anchored her charges of sex discrimination and sexual harassment in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Michigan Elliott-Larsen Act, Mich.Comp. Laws Ann. § 37.2101 *et seq.* A comparative analysis of the foregoing legislation disclosed that the language of the Elliott-Larsen Act disparate treatment statutory provision, enacted some ten years subsequent to the effective date of Title VII, essentially tracked the disparate treatment language of Title VII. It is apparent that the similarity was intentional. Moreover, as the district court indicated in its opinion:

> [T]he Michigan Civil Rights Commission has issued interpretive regulations indicating that Title VII should be used as a guide in the interpretation of the Elliott Larsen Act. Because the Civil Rights Commission is the state's chief civil rights administrative agency, the Commission's guidelines are a fairly strong argument cutting in favor of applying the Title VII disparate treatment model to plaintiff's Elliott Larsen disparate treatment claim.

Finally, and most importantly, the Michigan judiciary seems inclined toward this interpretation of the Elliott Larsen Act. While Michigan Courts have not adopted wholesale the federal employ-

ment discrimination standards, ... it remains that a good number of Michigan decisions resolve Elliott Larsen issues by reference to the legal standards codified in Title VII and the federal Age Discrimination Act.

*Rabidue,* 584 F.Supp. at 426 (footnotes omitted) (citing, *inter alia, Adama v. Doehler-Jarvis,* 115 Mich.App. 82, 320 N.W.2d 298 (1982), *rev'd on other grounds,* 419 Mich. 905, 353 N.W.2d 438 (1984); *Gallaway v. Chrysler Corp.,* 105 Mich. App. 1, 306 N.W.2d 368 (1981); *Michigan Department of Civil Rights v. Taylor School District,* 96 Mich.App. 43, 292 N.W.2d 161 (1980); *Michigan Department of Civil Rights v. General Motors Corp.,* 93 Mich.App. 366, 287 N.W.2d 240 (1979), *aff'd,* 412 Mich. 610, 317 N.W.2d 16 (1982)). In light of the foregoing, the district court's conclusion that the Elliott-Larsen Act disparate treatment provisions, Mich. Comp.Laws Ann. § 37.2202(1)(a) & (c), should be construed in the same manner as § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–(2)(a)(1) is AFFIRMED.[2]

■ This court has examined the trial court's disposition of the plaintiff's Title VII and Elliott-Larsen Act sex discrimination claims and the error assigned thereto. In arriving at its decision, the district court

---

ant Texas-American solely on its resolution of the successorship issue. Rather, the district court proceeded to independently resolve each of the plaintiff's substantive claims, charged pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Michigan Elliott-Larsen Act, Mich. Comp. Laws Ann. § 37.2101 *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d), as those claims concerned defendant Texas-American.

The plaintiff charged in the district court and argued on appeal that the alleged sex discrimination, and specifically the alleged sexually hostile work environment, were of an ongoing nature from the time of her employment by Osceola in 1970 and that such conditions continued to prevail for several months after Texas-American acquired Osceola while she was an employee of Texas-American. On appeal, the plaintiff not only argued that Texas-American was liable as a successor to United Refineries and Osceola, but specifically urged that Texas-American was liable for its own acts of commission and omission effected during the period of her employment

by Texas-American after its takeover of Osceola from United Refineries. In light of these allegations, this court is constrained to address the totality of the plaintiff's substantive counts, i.e., disparate treatment, sexual harassment, and retaliatory conduct, alleged to have occurred after the Texas-American acquisition, despite the fact that resolution of the successor liability issue in favor of the defendant absolved Texas-American of liability for any *pre* acquisition discriminatory actions.

2. This court also endorses the district court's conclusion that, absent an express successorship provision in either Title VII or the Elliott-Larsen Act and considering the Michigan Civil Rights Commission guidelines and the Michigan judiciary's inclination generally to adopt Title VII standards in the interpretation of the Elliott-Larsen Act, sufficient justification existed for applying Title VII successorship doctrine to the Elliott-Larsen Act sex discrimination and sexual harassment claims. *See Rabidue,* 584 F.Supp. at 427, 435 n. 58.

viewed the plaintiff's disparate treatment sex discrimination charge as alleging continuing sex-based discriminatory conduct on the part of the defendant culminating in the plaintiff's discharge. *Rabidue*, 584 F.Supp. at 424. A review of the record disclosed that the trial court's findings, namely that the company's predischarge actions toward the plaintiff did not evince an anti-female animus, were not clearly erroneous. Consequently, the trial court's conclusion that the plaintiff failed to establish violations of Title VII or the Elliott-Larsen Act in this regard is AFFIRMED.

■ In addressing the plaintiff's discriminatory discharge claim, the trial court noted that the plaintiff's allegations paralleled classic disparate treatment charges addressed by § 703(a)(1) of Title VII and articulated the classic assertions that she was discharged because she was a female. Subsequent to applying the criteria and procedure mandated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the trial court concluded that the plaintiff had failed to satisfy her burden of proof to support her contention that the defendant's advanced legitimate, nondiscriminatory reasons for her termination were pretextual and consequently had failed to sustain a disparate

treatment claim that resulted from her discharge under either Title VII or the Elliott-Larsen Act. *Rabidue*, 584 F.Supp. at 426–27. The lower court's determination that the plaintiff's discharge was not the result of gender-based discrimination was a factual finding subject to the clearly erroneous standard of review. *Pullman-Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 374 (6th Cir.1984). This court, having scrutinized the record, is of the opinion that the findings of fact and conclusions of law articulated in the trial court's cogent reasoning are not clearly erroneous and are accordingly AFFIRMED.[3]

The plaintiff's claim of sexual harassment derives from Title VII's proscription that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1) (§ 703(a)(1) of Title VII). The case law in this area has recognized two basic variants of sexual harassment: "harassment that creates an offensive environment ('condition of work') and harassment in which a supervisor demands sexual consideration in exchange for job benefits ('*quid pro quo*')." *Henson v. City of Dundee*, 682 F.2d 897, 908 (11th Cir.1982) (citing C. MacKinnon, Sexual Harassment of Working Women 32–47 (1979)). *See Meritor Sav-*

---

**3.** The dissent has cited evidence developed exclusively by the plaintiff without noting the wide disparity between the plaintiff's evidence when compared to the totality of the record as it bears upon her charges of disparate treatment, sexually hostile work environment, and discriminatory discharge. With particularity, the dissent has alluded to Henry's vulgarity and obscene characterizations as well as purported acts of disparate treatment and gender-based discrimination which, the trial record affirmatively disclosed, occurred while Osceola operated as an independent company or during its ownership by United Refineries—all before the Texas-American acquisition. Apart from the foregoing transcript disclosures, the plaintiff's probative evidence, at best, was vague and obscure in failing to reflect a continuation of those

actions after the Texas-American acquisition or the extent and circumstances of that alleged discriminatory conduct and sexual harassment, if it did in fact persist, that purportedly implicated Texas-American. Moreover, where, as here, the evidence was in conflict, credibility issues come within the discretion of the district court for resolution. In the instant case, the district court clearly assigned greater credibility and weight to the defendant's witnesses and its testimony than to the plaintiff and her witnesses as is evidenced by its opinion. This court, having reviewed the district court's interpretation of the evidence and its assignments of credibility pursuant to the clearly erroneous standard, cannot conclude that the trial court's interpretation of the evidence was clearly erroneous.

*ings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Downes v. Federal Aviation Administration,* 775 F.2d 288, 290–91 (Fed. Cir.1985); *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir. 1983). *See also* 1 Larson, Employment Discrimination § 41.64(c) (1985); K. McCulloch, Termination of Employment ¶ 10,103 (P–H 1984); Comment, Sexual Harassment Claims of Abusive Work Environment under Title VII, 97 Harv.L.Rev. 1449, 1454–55 (1984); Annot., 46 A.L.R. Fed. 224 (1980 & Supp. 1985).

This circuit has entertained cases involving a spectrum of sexual harassment issues; however, it has not directly addressed a claim asserting a violation of Title VII based upon an alleged sexually discriminatory work environment which had not resulted in a tangible job detriment as joined by the issues of the plaintiff's charges herein. *See, e.g., Easter v. Jeep Corp.,* 750 F.2d 520 (6th Cir.1984); *EEOC v. Maxwell Co.,* 726 F.2d 282 (6th Cir.1984); *Held v. Gulf Oil Co.,* 684 F.2d 427 (6th Cir.1982). Although the *quid pro quo* category of sexual harassment appears to have given rise to the greatest proliferation of case law to date, other circuits have recognized that an offensive work environment could, under appropriate circumstances, constitute Title VII sexual harassment without the necessity of asserting or proving tangible job detriment by the harassed employee, which proof underlies the *quid pro quo* variant of sexual harassment. *See Henson,* 682 F.2d at 902; *Bundy v. Jackson,* 641 F.2d 934, 943–44 (D.C. Cir.1981). Moreover, the Supreme Court has recently permitted a plaintiff to pursue a Title VII cause of action arising as a result of discrimination based upon sexually hostile or abusive work environment. *Meritor Savings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 2404–06, 91 L.Ed.2d 49 (1986).

In addressing the issues presented by such a sexual harassment charge, this court's attention is initially directed to the guidelines issued by the Equal Employment Opportunity Commission (EEOC) as an informed source of instruction to assist its efforts to probe the parameters of Title VII sexual harassment.[4] Those guidelines define sexual harassment in the following terms:

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (footnote omitted).

After having considered the EEOC guidelines and after having canvassed existing legal precedent that has discussed the issue, this court concludes that a plaintiff, to prevail in a Title VII offensive work environment sexual harassment action, must assert and prove that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psycho logical well-being of the plaintiff; and (5) the existence

---

**4.** The EEOC guidelines are intra-agency suggested interpretive regulations that are not binding upon courts, *see Vinson,* 106 S.Ct. at 2405; *General Electric Co. v. Gilbert,* 429 U.S. 125, 140–45, 97 S.Ct. 401, 410–12, 50 L.Ed.2d 343 (1976); however, a number of courts have accorded them favorable consideration in resolving issues of charged sexual harassment, *see Vinson,* 106 S.Ct. at 2405; *Downes,* 775 F.2d at 291; *Henson,* 682 F.2d at 903; *Bundy,* 641 F.2d at 947.

of respondeat superior liability. *See Vinson,* 106 S.Ct. at 2404–06; *Downes,* 775 F.2d at 292–95; *Katz,* 709 F.2d at 254; *Henson,* 682 F.2d at 903–05. *Cf. Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1253–59 (6th Cir.1985) (racial hostile work environment claim); *Torres v. County of Oakland,* 758 F.2d 147, 152 (6th Cir. 1985) (national origin hostile work environment claim).

■ Thus, to prove a claim of abusive work environment premised upon sexual harassment, a plaintiff must demonstrate that she would not have been the object of harassment but for her sex. *Henson,* 682 F.2d at 904 (citations omitted). It is of significance to note that instances of complained of sexual conduct that prove equally offensive to male and female workers would not support a Title VII sexual harassment charge because both men and women were accorded like treatment. *Id.* (citing, *inter alia, Barnes v. Costle,* 561 F.2d 983, 990 n. 55 (D.C. Cir.1977); *Bradford v. Sloan Paper Co.,* 383 F.Supp. 1157, 1161 (N.D. Ala.1974); Note, Sexual Harassment and Title VII, 76 U.Mich.L.Rev. 1007, 1020–21 & n. 99, 1033 & n. 178 (1978); Comment, Sexual Harassment and Title VII, 51 N.Y.U.L.Rev. 148, 151–52 (1976)).

■ Unlike *quid pro quo* sexual harassment which may evolve from a single incident, sexually hostile or intimidating environments are characterized by multiple and varied combinations and frequencies of offensive exposures, which characteristics would dictate an order of proof that placed the burden upon the plaintiff to demonstrate that injury resulted not from a single or isolated offensive incident, comment, or conduct, but from incidents, comments, or conduct that occurred with some frequency. To accord appropriate protection to both plaintiffs and defendants in a hostile and/or abusive work environment sexual harassment case, the trier of fact, when judging the totality of the circumstances impacting upon the asserted abusive and hostile environment placed in issue by the plaintiff's charges, must adopt the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances. Thus, in the absence of conduct which would interfere with that hypothetical reasonable individual's work performance and affect seriously the psychological well-being of that reasonable person under like circumstances, a plaintiff may not prevail on asserted charges of sexual harassment anchored in an alleged hostile and/or abusive work environment regardless of whether the plaintiff was actually offended by the defendant's conduct. Assuming that the plaintiff has successfully satisfied the burden of proving that the defendant's conduct would have interfered with a reasonable individual's work performance and would have affected seriously the psychological well-being of a reasonable employee, the particular plaintiff would nevertheless also be required to demonstrate that she was actually offended by the defendant's conduct and that she suffered some degree of injury as a result of the abusive and hostile work environment.

■ Accordingly, a proper assessment or evaluation of an employment environment that gives rise to a sexual harassment claim would invite consideration of such objective and subjective factors as the nature of the alleged harassment, the background and experience of the plaintiff, her coworkers, and supervisors, the totality of the physical environment of the plaintiff's work area, the lexicon of obscenity that pervaded the environment of the workplace both before and after the plaintiff's introduction into its environs, coupled with the reasonable expectation of the plaintiff upon voluntarily entering that environment. Thus, the presence of actionable sexual harassment would be different depending upon the personality of the plaintiff and the prevailing work environment and must be considered and evaluated upon an ad hoc basis. As Judge Newblatt aptly stated in his opinion in the district court:

> Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations

and girlie magazines may abound. Title VII was not meant to—or can—change this. It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But it is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers. Clearly, the Court's qualification is necessary to enable 29 C.F.R. § 1604.11(a)(3) to function as a workable judicial standard.

*Rabidue,* 584 F.Supp. at 430.[5]

▮▮▮▮ To prevail in an action that asserts a charge of offensive work environment sexual harassment, the ultimate burden of proof is upon the plaintiff to additionally demonstrate respondeat superior liability by proving that the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action. *See Barrett v. Omaha National Bank,* 726 F.2d 424, 427–28 (8th Cir.1984); *Katz v. Dole,* 709 F.2d 251, 255–56 (4th Cir.1983); *Henson,* 682 F.2d 905, 910 n. 20. *Cf. Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1254 (6th Cir.1985) (racial hostile working environ-

ment). *See generally* 1 Larson, Employment Discrimination § 41.65 (1985). The promptness and adequacy of the employer's response to correct instances of alleged sexual harassment is of significance in assessing a sexually hostile environment claim and the employer's reactions must be evaluated upon a case by case basis. *See, e.g., Barrett,* 726 F.2d at 427.[6]

▮▮▮ In considering an order of proof to implement the resolution of Title VII sexually hostile working environment controversies, this court has reviewed the procedure enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and has concluded that the order of proof and procedures enunciated therein are not readily adaptable to developing the proofs and defenses in this type of Title VII action. It would appear that the most effective and efficient procedural format would implement the traditional practice of placing the ultimate burden of proof by a preponderance of the evidence upon the claimant followed by a proffer of defense and an opportunity for a plaintiff's rebuttal.

5. Such an approach is not inconsistent with the EEOC guidelines, which emphasize the individualized nature of a probative inquiry:

> (b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11(b).

The dissent's focus on certain of the above factors in isolation is misplaced. The district court possesses broad discretion as to the evidence to be considered in evaluating the totality of the circumstances and the context of the alleged incidents. This court has merely attempted to identify in general terms some criteria that may potentially enter into a case-by-case examination of the totality of the evidence in such a case, without inferring the weight to be

accorded in the first instance by the district court to any particular factor.

6. Although the Supreme Court in *Vinson* declined to issue a definitive rule on employer liability arising from the acts of supervisory personnel in sexually hostile environment cases, it stated that Congress intended the courts to look to common law principles of agency for guidance in this area. 106 S.Ct. at 2408.

This court emphasizes that the instant case does not involve alleged acts of sexual harassment by a supervisor. Henry exercised no supervisory authority over the plaintiff nor the plaintiff over him, but rather the two parties were peers at Osceola and at all times pertinent hereto. Accordingly, the majority opinion, like the *Vinson* Court, expresses no view as to the scope of respondeat superior liability in the context of a charge of a sexually hostile working environment where alleged acts of harassment by a plaintiff's supervisor are at issue and not, as here, the alleged acts of a peer in the workplace.

A review of the Title VII sexual harassment issue in the matter *sub judice* prompts this court to conclude that the plaintiff neither asserted nor proved a claim of "sexual advances," "sexual favors," or "physical conduct," or sexual harassment implicating subparts (a)(1) or (a)(2) of the EEOC definition, more specifically, those elements typically at issue in a case of *quid pro quo* sexual harassment. Thus, the plaintiff to have prevailed in her cause of action against the defendant on this record must have proved that she had been subjected to unwelcomed verbal conduct and poster displays of a sexual nature which had unreasonably interfered with her work performance and created an intimidating, hostile, or offensive working environment that affected seriously her psychological well-being.

■ In the case at bar, the record effectively disclosed that Henry's obscenities, although annoying, were not so startling as to have affected seriously the psyches of the plaintiff or other female employees. The evidence did not demonstrate that this single employee's vulgarity substantially affected the totality of the workplace. The sexually oriented poster displays had a de minimis effect on the plaintiff's work environment when considered in the context of a society that condones and publicly features and commercially exploits open displays of written and pictorial erotica at the newsstands, on prime-time television, at the cinema, and in other public places. In sum, Henry's vulgar language, coupled with the sexually oriented posters, did not result in a working environment that could be considered intimidating, hostile, or offensive under 29 C.F.R. § 1604.11(a)(3) as elaborated upon by this court.[7] The district court's factual findings supporting its conclusion to this effect were not clearly erroneous. It necessarily follows that the plaintiff failed to sustain her burden of proof that she was the victim of a Title VII sexual harassment violation.[8] Accordingly, the trial court's disposition of this issue is AFFIRMED.

■ The relevant Elliott Larsen Act sexual harassment provision attendant to this action arises from Mich. Comp. Laws Ann. § 37.2103(h)(iii), which reads as follows:

(h) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when ... (iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive employment ... environment.

7. The precedential cases addressing a sexually hostile and abusive environment within the context of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 29 C.F.R. § 1604.-11(a)(3) have all developed more compelling circumstances than are presented herein. In *Bundy*, both the plaintiff's co-employees and supervisors harassed her with conduct that included continual personal and telephonic sexual propositions both at work and at her home and the plaintiff's complaints inspired her supervisor to also proposition her. 641 F.2d at 939–40. In *Henson*, the plaintiff was subjected to numerous harangues and demeaning inquiries into her sexual proclivities, vulgarities, and repeated requests for sexual relations from her supervisor, the police chief. 682 F.2d at 899–901. In *Katz*, several supervisory personnel and co-workers bombarded the plaintiff with sexual slurs, insults, innuendo, and propositions, the plaintiff's complaints to her supervisor generated further harassment from him, and the plaintiff's supervisor admitted having heard co-workers direct obscenities to the plaintiff. 709 F.2d at 253–54. In the case at bar, the charges of sexually hostile and abusive environment were limited to pictorial calendar type office wall displays of semi-nude and nude females and Henry's off-color language. Unlike the facts of *Bundy, Henson,* and *Katz,* this case involved no sexual propositions, offensive touchings, or sexual conduct of a similar nature that was systematically directed to the plaintiff over a protracted period of time.

8. As noted in the trial court's opinion, the successorship defense would have precluded preacquisition liability even if the sexual harassment ruling had not been in favor of the defendant. *Rabidue,* 584 F.Supp. at 433. However, this court's disposition of the sexual harassment charges renders the successorship argument a redundant defense.

Here again it is obvious that the text of the above subsection was closely modeled after 29 C.F.R. § 1604.11(a)(3). The only apparent difference between the two provisions is that the EEOC guidelines incorporate the phrase "unreasonably interfering" rather than the Elliott-Larsen Act's phrase "substantially interfering." Thus, for the reasons hereinbefore articulated in the comparative analysis of Title VII with the Elliott-Larsen Act, the plaintiff's exposure to Henry's obscene language and the sexually oriented posters did not rise to a level substantially interfering with the plaintiff's work performance that created an intimidating, hostile, or offensive work environment which affected seriously her psychological well-being in violation of the Elliott-Larsen Act and the district court's conclusion in this respect is therefore AFFIRMED.

 In addressing the Equal Pay Act violation asserted by the plaintiff, this court also finds itself in agreement with the district court's decision that the plaintiff failed to meet her burden of proof to establish a prima facie case under the Act by demonstrating that she performed a job that required substantially equal skill, effort, and responsibility, but that she received less than equal pay. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Bence v. Detroit Health Corp.,* 712 F.2d 1024, 1029 (6th Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984); *Odomes v. Nucare,Inc.,* 653 F.2d 246, 250 (6th Cir.1981). *See generally* 1 Larson, Employment Discrimination § 29.60 (1985). The plaintiff's testimony concerning her perception of the distribution of isolated fringe benefits simply did

not rise to the level of a prima facie case.[9] The district court's disposition of the plaintiff's Equal Pay Act claim is AFFIRMED.

Finally, the record having failed to develop probative evidence of retaliatory conduct by the defendant Texas-American, the plaintiff's inartfully pleaded cause of action arising thereunder is accordingly dismissed. *See Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.,* 783 F.2d 50, 54 (6th Cir.1986).[10]

For the reasons stated herein, the plaintiff having failed to sustain any of the claims which she has asserted, the judgment of the district court in favor of defendant is hereby AFFIRMED.

---

KEITH, Circuit Judge, concurring in part, dissenting in part.

I concur in the portion of the majority opinion which finds no successor liability. However, as I believe the majority erroneously resolves plaintiff's substantive claims, I dissent.

I dissent for several reasons. First, after review of the entire record I am firmly convinced, that although supporting evidence exists, the court is mistaken in affirming the findings that defendant's treatment of plaintiff evinced no anti-female animus and that gender-based discrimination played no role in her discharge. The overall circumstances of plaintiff's workplace evince an anti-female environment. For seven years plaintiff worked at Osceola as the sole woman in a salaried management position. In common work areas plaintiff and other female employees were exposed daily to displays of nude or partially clad women belonging to a number of

---

**9.** The Equal Pay Act, part of the Fair Labor Standards Act, prohibits differences in pay on the basis of sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," subject to certain specified exceptions. See 29 U.S.C. § 206(d)(1).

**10.** This court notes that the plaintiff did not allege any claim of retaliatory conduct in her complaint arising under the "opposition clause"

of Title VII, 42 U.S.C. § 2000e-3(a), on which she later expressly relied on appeal in suggesting that she had proved a case of retaliatory conduct, nor did she in fact in her complaint allege the underlying facts upon which she later relied on appeal, nor does the record support the fact that she pressed retaliatory conduct as an independent claim distinct from her generalized Title VII pleaded allegations, and the district court did not address the issue as a distinct claim in its opinion.

male employees at Osceola. One poster, which remained on the wall for eight years, showed a prone woman who had a golf ball on her breasts with a man standing over her, golf club in hand, yelling "Fore." And one desk plaque declared "Even male chauvanist pigs need love." Plaintiff testified the posters offended her and her female co-workers.

In addition, Computer Division Supervisor Doug Henry regularly spewed anti-female obscenity. Henry routinely referred to women as "whores," "cunt", "pussy" and "tits." *See Rabidue v. Osceola*, 584 F.Supp. 419, 423 (E.D. Mich.1984). Of plaintiff, Henry specifically remarked "All that bitch needs is a good lay" and called her "fat ass." Plaintiff arranged at least one meeting of female employees to discuss Henry and repeatedly filed written complaints on behalf of herself and other female employees who feared losing their jobs if they complained directly. Osceola Vice President Charles Muetzel stated he knew that employees were "greatly disturbed" by Henry's language. However, because Osceola needed Henry's computer expertise, Muetzel did not reprimand or fire Henry. In response to subsequent complaints about Henry, a later supervisor, Charles Shoemaker, testified that he gave Henry "a little fatherly advice" about Henry's prospects if he learned to become "an executive type person."

In addition to tolerating this anti-female behavior, defendant excluded plaintiff, the sole female in management, from activities she needed to perform her duties and progress in her career. Plaintiff testified that unlike male salaried employees, she did not receive free lunches, free gasoline, a telephone credit card or entertainment privileges. Nor was she invited to the weekly golf matches. Without addressing defendant's disparate treatment of plaintiff, the district court dismissed these perks and business activities as fringe benefits. After plaintiff became credit manager defendant prevented plaintiff from visiting or taking customers to lunch as all previous male credit managers had done. Plaintiff testified that upon requesting such privi-

leges, her supervisor, Mr. Muetzel, replied that it would be improper for a woman to take male customers to lunch and that she "might have car trouble on the road." Plaintiff reported that on another occasion, Muetzel asked her "how would it look for me, a married man, to take you, a divorced woman, to the West Branch Country Club in such a small town?" However, defendant apparently saw no problem in male managers entertaining female clients regardless of marital status. Plaintiff's subsequent supervisor, Charles Shoemaker, stated to another female worker, Joyce Solo, that "Vivienne (plaintiff) is doing a good job as credit manager, but we really need a man on that job," adding "She can't take customers out to lunch." Aside from this Catch–22, Mr. Shoemaker also remarked plaintiff was not forceful enough to collect slow-paying jobs. How plaintiff can be so abrasive and aggressive as to require firing but too timid to collect delinquent accounts is, in my view, an enigma.

My review of the record also shows plaintiff was consistently accorded secondary status. Plaintiff recounted that at a meeting convened to instruct clerical employees on their duties after the United States Refineries takeover, plaintiff was seated with female hourly employees. The male salaried employees, apparently pre-informed of the post-takeover procedures, stood at the front of the room. Plaintiff confronted Muetzel to express surprise at being addressed as a clerical employee and to ask what her post-takeover role would entail. Muetzel responded plaintiff would have whatever role was handed to her. At the suggestion of her former boss, Mr. Hansen, plaintiff wrote a memo summarizing her qualifications and pleading for non-sex based consideration for post-takeover positions. She received no response to this memo.

In contrast to the supervisors' reluctance to address Henry's outrageous behavior, plaintiff was frequently told to tone down and discouraged from executing procedures she felt were needed to correct waste and improve efficiency as her job required.

Not only did plaintiff receive minimal support, but she was repeatedly undermined. For example, supervisor Doug Henry once directed his employees to ignore plaintiff's procedures for logging time and invoices, a particularly damaging directive given plaintiff's responsibility of coordinating the work of Henry's computer staff. In another example, plaintiff returned from her vacation to find that none of the check depositing procedures agreed upon had been implemented and that some of her duties had been permanently transferred to the male who filled in during her vacation. In contrast to the fatherly advice and the praise for potential which Henry received, plaintiff was informed she had set her goals too high. After dismissal, but prior to final notice, plaintiff received instructions not to return to the refinery. In contrast, male employees fired for embezzlement were allowed to return to clean out their desks. Upon dismissal, plaintiff reported that Shoemaker advised her to get a secretarial job.

The record establishes plaintiff possessed negative personal traits. These traits did not, however, justify the sex-based disparate treatment recounted above. Whatever undesirable behavior plaintiff exhibited, it was clearly no worse than Henry's. I conclude the misogynous language and decorative displays tolerated at the refinery (which even the district court found constituted a "fairly significant" part of the job environment), the primitive views of working women expressed by Osceola supervisors and defendant's treatment of plaintiff as the only female salaried employee clearly evince anti-female animus.

Second, I dissent because I am unable to accept key elements of the standard for sexual harassment set forth in the majority opinion. Specifically, I would not impose on the plaintiff alleging hostile environment harassment an additional burden of proving respondeat superior liability where a supervisor is responsible for the harm. In *Meritor Savings Bank v. Vinson,* —— U.S. ——, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court instructed courts to determine employer liability according to

agency principles. *Id.* —— U.S. ——, 106 S.Ct. at 2407. Agency principles establish that an employer is normally liable for the acts of its supervisors and agents. *Id.* Because a supervisor is "clothed with the employer's authority" and is responsible for the "day-to-day supervision of the work environment and with ensuring a safe, productive workplace," his abusive behavior in violation of that duty should be imputed to the employer just as with any other supervisory action which violates Title VII. *Id.* —— U.S. at ——, 106 S.Ct. at 2410–11 (J. Marshall concurring, joined by JJ. Brennan, Blackmun and Stevens). The creation of a discriminatory work environment by a supervisor can only be achieved through the power accorded him by the employer. I see insufficient reason to add an element of proof not imposed on any other discrimination victim, particularly where agency principles and the "goals of Title VII law" preclude the imposition of automatic liability in all circumstances. *Id.* As Justice Marshall concludes:

> There is therefore no justification for a special rule, to be applied only in "hostile environment" cases, that sexual harassment does not create employer liability until the employee suffering the discrimination notifies other supervisors. No such requirement appears in the statute, and no such requirement can coherently be drawn from the law of agency....
>
> I would apply in this case the same rules we apply in all other Title VII cases, and hold that sexual harassment by a supervisor of an employee under his supervision, leading to a discriminatory work environment, should be imputed to the employer for Title VII purposes regardless of whether the employee gave "notice" of the offense.

*Id.*

In cases of hostile work environment harassment by coworkers, I would follow guidelines set forth by the Equal Employment Opportunity Commission:

> With respect to conduct between fellow employees, an employer is responsible

for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate action.

29 C.F.R. §§ 1604.11(d) (1985).

Nor do I agree with the majority holding that a court considering hostile environment claims should adopt the perspective of the reasonable person's reaction to a similar environment. At 619. In my view, the reasonable person perspective fails to account for the wide divergence between most women's views of appropriate sexual conduct and those of men. *See* Comment, *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv.L.Rev. 1449, 1451 (1984). As suggested by the Comment, I would have courts adopt the perspective of the reasonable victim which simultaneously allows courts to consider salient sociological differences as well as shield employers from the neurotic complainant. *Id.* at 1459. Moreover, unless the outlook of the reasonable woman is adopted, the defendants as well as the courts are permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders, in this case, men. *Id.*

Which brings me to the majority's mandate to consider the "prevailing work environment," "the lexicon of obscenity that pervaded the environment both before and after plaintiff's introduction into its environs," and plaintiff's reasonable expectations upon "voluntarily" entering that environment. At 620. The majority suggests through these factors that a woman assumes the risk of working in an abusive, anti-female environment. Moreover, the majority contends that such work environments somehow have an innate right to perpetuation and are not to be addressed under Title VII:

Indeed, it cannot seriously be disputed that in some work environments, humor and language are rough hewn and vulgar. Sexual jokes, sexual conversations and girlie magazines may abound. Title VII was not meant to—or can—change this. It must never be forgotten that Title VII is the federal court mainstay in the struggle for equal employment opportunity for the female workers of America. But is quite different to claim that Title VII was designed to bring about a magical transformation in the social mores of American workers. Clearly, the Court's qualification is necessary to enable 29 C.F.R. § 1604.11(a)(3) to function as a workable judicial standard.

At 620 (quoting the district court opinion, *Osceola v. Rabidue*, 584 F.Supp. at 430.)

In my view, Title VII's precise purpose is to prevent such behavior and attitudes from poisoning the work environment of classes protected under the Act. To condone the majority's notion of the "prevailing workplace" I would also have to agree that if an employer maintains an anti-semitic workforce and tolerates a workplace in which "kike" jokes, displays of nazi literature and anti-Jewish conversation "may abound," a Jewish employee assumes the risk of working there, and a court must consider such a work environment as "prevailing." I cannot. As I see it, job relatedness is the only additional factor which legitimately bears on the inquiry of plaintiff's reasonableness in finding her work environment offensive. In other words, the only additional question I would find relevant is whether the behavior complained of is required to perform the work. For example, depending on their job descriptions, employees of soft pornography publishers or other sex-related industries should reasonably expect exposure to nudity, sexually explicit language or even simulated sex as inherent aspects of working in that field. However, when that exposure goes beyond what is required professionally, even sex industry employees are protected under the Act from non-job related sexual demands, language or other offensive behavior by supervisors or co-workers. As I believe no woman should be subjected to an environment where her sexual dignity and reasonable sensibilities are visually, verbally or physically assaulted as

a matter of prevailing male prerogative, I dissent.

The majority would also have courts consider the background of plaintiff's co-workers and supervisors in assessing the presence of actionable work environment sex harassment. The only reason to inquire into the backgrounds of the defendants or other co-workers is to determine if the behavior tolerated toward female employees is reasonable in light of those backgrounds. As I see it, these subjective factors create an unworkable standard by requiring the courts to balance a morass of perspectives. But more importantly, the background of the defendants or other workers is irrelevant. No court analyzes the background and experience of a supervisor who refuses to promote black employees before finding actionable race discrimination under Title VII. An equally disturbing implication of considering defendants' backgrounds is the notion that workplaces with the least sophisticated employees are the most prone to anti-female environments. Assuming *arguendo* * this notion is true, by applying the prevailing workplace factor, this court locks the vast majority of working women into workplaces which tolerate anti-female behavior. I conclude that for actionable offensive environment claims, the relevant inquiry is whether the conduct complained of is offensive to the reasonable woman. Either the environment affects her ability to perform or it does not. The backgrounds and experience of the defendant's supervisors and employees is irrelevant.

Nor can I agree with the majority's notion that the effect of pin-up posters and misogynous language in the workplace can have only a minimal effect on female employees and should not be deemed hostile or offensive "when considered in the context of a society that condones and publicly features and commercially exploits open displays of written and pictorial erotica at newsstands, on prime-time television, at the cinema and in other public places." At 622. "Society" in this scenario must primarily refer to the unenlightened; I hardly believe reasonable women condone the pervasive degradation and exploitation of female sexuality perpetuated in American culture. In fact, pervasive societal approval thereof and of other stereotypes stifles female potential and instills the debased sense of self worth which accompanies stigmatization. The presence of pin-ups and misogynous language in the workplace can only evoke and confirm the debilitating norms by which women are primarily and contemptuously valued as objects of male sexual fantasy. That some men would condone and wish to perpetuate such behavior is not surprising. However, the relevant inquiry at hand is what the reasonable woman would find offensive, not society, which at one point also condoned slavery. I conclude that sexual posters and anti-female language can seriously affect the psychological well being of the reasonable woman and interfere with her ability to perform her job.

Finally, I find probative evidence supports plaintiff's retaliation claim. Plaintiff presented substantial evidence that her supervisor Charles Shoemaker withheld her unemployment benefits because she filed a sex discrimination complaint. Joyce Solo, a co-worker, testified that right after plaintiff was fired and filed charges, Shoemaker stated he "would have let [plaintiff] have her unemployment, except she filed sex discrimination charges and it made me mad so I charged her with misconduct." Another employee also testified that Shoemaker instructed Osceola employees to write up negative encounters with plaintiff or they might have to have her return to work. Thus, plaintiff presented evidence showing Shoemaker accorded her adverse treatment because she filed a sex discrimination charge. This is a prima facie case of retaliation which should have been addressed by the district court and not dismissed by this

---

* I do not assert any correlation exists between the level of social sophistication present in a work environment and anti-female behavior.

court as an "inartfully pleaded" cause of action.

In conclusion, I dissent because the record shows that defendant's treatment of plaintiff evinces anti-female animus and that plaintiff's gender played a role in her dismissal. I also believe the hostile environment standard set forth in the majority opinion shields and condones behavior Title VII would have the courts redress. Finally, in my view, the standard fails to encourage employers to set up internal complaint procedures or otherwise seriously address the problem of sexual harassment in the workplace.