826 F.2d 1485
 44 Fair Empl.Prac.Cas. 857,
44 Empl. Prac. Dec. P 37,369
KENT COUNTY SHERIFF'S ASSOCIATION, and Patricia A. Musgrave,
Plaintiffs-Appellees, Cross-Appellants,
v.
COUNTY OF KENT, et al., Defendants,
Philip J. Heffron, individually and as Sheriff of Kent
County, Defendant-Appellant, Cross-Appellee.
 Nos. 86-1305, 86-1393.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 12, 1987.
Decided Aug. 13, 1987.
 
 Sheila A. Kinney, argued, Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, Mich., and Douglas W. VanEssen and Jack R. Clary, for Heffron.
 Ronald J. Kollen, argued, Dan E. Hankins, Hankins & Associates, P.C., Okemos, Mich., and Edith C. Harsh, for plaintiffs-appellees, cross-appellants.
 Charles H. Noble, Sou Noble & Wiseman, Southfield, Mich., for Kent Co.
 Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 This case involves a Title VII discrimination claim brought by a female employee of the Kent County, Michigan, Sheriff's office. Patricia Musgrave, plaintiff, and the association representing deputy sheriffs of Kent County (KCDSA) have sued Kent County, its Board of Commissioners, and Sheriff Philip Heffron contending that defendants had discriminatorily denied Musgrave's request to transfer from the corrections division to the Peacekeeping or road patrol division of the sheriff's department.[1] The district court granted plaintiffs a portion of the relief sought, and both parties appealed.
 
 I.
 
 2
 All road patrol deputies are required by state law to be certified by the Michigan Law Enforcement Officers Training Council (MLEOTC). This certification may be obtained only from the state agency after successfully completing training and testing, including a physical agility test. Part of the road patrol consists of emergency medical vehicles equipped with advanced life support systems as well as drugs and life saving apparatus. Vehicles are staffed by MLEOTC certified road patrol officers who have also obtained emergency medical technician (EMT) certification.[2] The Kent County Sheriff's department operates six of these emergency medical vehicles at all times.
 
 
 3
 Sheriff Heffron's predecessors followed a practice of hiring corrections officers to work in the jail with the understanding that they might, if qualified, have a later opportunity to transfer to the road patrol. Transfers would occur as positions became open, based on the officers' interest, seniority, and qualifications, as determined by the Sheriff.
 
 
 4
 When he became sheriff in 1975, defendant Heffron claimed to follow a different approach, and established a policy of hiring individuals to work in one of two separate career ladders: corrections or peacekeeping. This separate career ladder policy was never put in writing, but the Sheriff testified that he made the policy known to "all the employees," and to all new hires after that date.[3] Plaintiff, hired in November, 1976, testified: "I was told by Sheriff Heffron that if I was qualified, I could work my way into any area in that department.... He assured me that this would not be a stagnant position that I would be stuck in for my career."
 
 
 5
 Sheriff Heffron agreed to provide an opportunity for guards hired before July 1, 1975, to become MLEOTC certified and to be considered for transfer to the road patrol as openings occurred. The 1975 collective bargaining agreement between the Sheriff and the Association incorporated this commitment. It provided that "all guards hired prior to July 1, 1975, will be certified for patrolman duty." The Sheriff said that the reason for that contract language was to provide guards hired by prior administrations an opportunity for their expected certification and transfer consideration. KCDSA Vice-President John Belile, when asked by his counsel whether the above contract language established a separate career ladder, conceded that it had "always" been implied that "that was the intent or meaning."
 
 
 6
 Of the female guards hired before July 1, 1975, only Deputy Connie Fisher was certified and transferred to the road patrol. Sheriff Heffron provided her with MLEOTC certification at County expense and placed her into the road patrol, but only after Musgrave filed suit. After she and a male co-worker went back to corrections due to a road patrol funding cut-back, Fisher was later offered the chance to return to the road patrol.
 
 
 7
 In April, 1982, two road patrol officers lost their paramedic certification; they had to be removed from the emergency medical units and restricted to patrolling in regular patrol cars. This reduced the number of road patrol officers assigned to emergency units, and would have required taking paramedic units out of service to the public. Only two corrections officers, Thomas Hillen and Robert VanderLaan, then had the requisite paramedic credentials. These two male deputies were transferred from the jail to the road patrol, and were assigned to work in the emergency units. The two deputies who had lost their certification were transferred back into the corrections division.
 
 
 8
 The Hillen and VanderLaan transfer occurred more than a month before plaintiff first applied for a road patrol position. Those transfers involved road patrol positions for which plaintiff concededly was not qualified even at the time of trial, which took place much later. Both of these male deputies were, like plaintiff, hired after July 1, 1975, but each had less seniority than plaintiff, who therefore claimed disparate treatment based on sex discrimination since she was denied permission to transfer. The district court, however, found no evidence of sex discrimination in the transfers of Hillen and VanderLaan, nor any harm to plaintiff resulting therefrom, since it found that she lacked the required certification at that time. The district court's ruling also concluded that the emergency medical certification was not imposed as a pretext to discriminate against plaintiff, and that she "cannot base any of her claims on that particular transfer incident."
 
 
 9
 Defendants contend that due to low turnover and numerous funding cuts in the department, it was several years before qualified correction officers, hired before July 1, 1975, could transfer into road patrol. No contrary proof was offered by the plaintiffs. The list of eligible transfer candidates had been exhausted at least by May 22, 1982, the date Musgrave completed her law enforcement certification training.
 
 
 10
 In addition to a June 3, 1982, letter from Musgrave requesting a transfer to peacekeeping (and road patrol service), Sheriff Heffron had previously received and continued to receive both oral and written requests from plaintiff and others for a transfer. Except for plaintiff, all of the corrections officers requesting such transfers were males. With the two exceptions noted, Sheriff Heffron never granted the transfer request of any corrections officer hired after July 1, 1975.
 
 
 11
 In December of 1983, the Sheriff sent four road patrol officers to a privately funded, condensed program for emergency medical training at a local junior college. The four officers, all of them males and in road patrol service, were released from work for the extensive training under the program. Plaintiff applied for one of these positions, but was denied because she was not then in the road patrol division.
 
 
 12
 Musgrave admitted there was no road patrol position posted or available either at the time of her June 3, 1982, application, or by the time suit was instituted. None, in fact, occurred until December, 1983. In December, defendant engaged in an open recruitment campaign for qualified officers and, in March of 1984, he hired the first two certified road patrol officers with emergency medical training from outside the Sheriff's department: a female and a male.
 
 
 13
 The KCDSA and Musgrave alleged that the Sheriff intentionally discriminated against Musgrave and other similarly situated females by treating them differently from male deputies with regard to transfers to the road patrol.[4] The complaint alleged sex discrimination under 42 U.S.C. sections 1983 and 1985 and Title VII (42 U.S.C. Sec. 2000e), and state law claims. The supplemental complaint sought additional relief for Musgrave based on the sending of the four male deputies to EMT training school. She also sought reimbursement totalling over $7,700 for tuition for EMT training, (2) sponsorship by the county so she could achieve EMT-III status, and (3) transfer to the road patrol.
 
 
 14
 The trial court denied plaintiffs' request for a temporary restraining order prior to the trial on the merits. At the time of trial in October of 1984, there were two openings in the road patrol division which were made known to the public as well as to the corrections division. Agility tests were required, which Musgrave refused to take. After trial, and in order to be able to fashion relief, the trial court issued a stay precluding the Sheriff from filling these two positions. The court also later set aside the Sheriff's "two career ladder policy", and ordered Musgrave placed in one of the positions on the condition that she take, and pass, the agility test. The trial court also directed the second road patrol position to be filled with the senior, most interested corrections division officer, provided that he or she was MLEOTC certified and could pass the agility test. The court having previously found that "deputies assigned to the road patrol receive the same salary as those assigned to corrections and that Musgrave had failed to show that there are any differences in the opportunities for career advancement between the two divisions," denied any extraordinary relief at the outset.
 
 
 15
 We summarize the district court's pertinent findings of fact:
 
 
 16
 1) Before the 1984 advertisements to the public, "[n]o one ha[d] been hired from outside of the department for a position on the road patrol."
 
 
 17
 2) "[I]t took from 1975 to 1984 to exhaust the supply of corrections deputies hired before July 1, 1975 who are interested in and qualified for a transfer to the road patrol."
 
 
 18
 3) "[T]here are eleven deputies who were hired post-July 1, 1975 and who have department seniority ... greater than or equal to Musgrave's ... none ... have sought or presently desire a transfer out of corrections and to the road patrol."
 
 
 19
 4) Musgrave "is MLEOTC certified," and thus is qualified, if she can pass the physical agility test, for road patrol. There is no evidence that the test has been required only of females.
 
 
 20
 5) "[T]he career ladder policy was not understood throughout the department".
 
 
 21
 6) While the court "commends the sheriff for running a department that is not so constrained by bureaucracy that transfers to accommodate the needs of the employees or the department cannot be implemented", nonetheless, the Sheriff's transfers "[w]ere in fact based on convenience and necessity, and not on a two career ladder policy".
 
 
 22
 7) "[T]hirteen, or 5.44 percent, of the deputies were female.... Only one female had served on the road patrol prior to the commencement of this action."
 
 
 23
 8) "[T]here are no female sergeants, lieutenants or captains in the sheriff's department. In fact, no female has ever been an officer...."
 
 
 24
 9) "[T]he sheriff's department hired seventeen females and forty-nine males between January 1, 1980 and July 1, 1983. During the same period of time, thirty-four men and eighteen women left the employ of the department while twenty-five males and four females were promoted."10) "The fact that Musgrave has had to pursue EMT training at her own expense and on her own time is also insufficient to establish sex bias", as male deputies had to do the same.
 
 
 25
 11) Deputy Fairbrother (a male) was granted a letter request to transfer in due course from the road patrol to jail duty in August of 1982; Musgrave's letter request of July, 1982, to transfer from corrections to road patrol was not granted.
 
 
 26
 12) "Musgrave has been kept in something akin to a catch-22 by the sheriff's department. The evidence demonstrates that the sheriff transfers whichever deputy he wants to transfer whenever he deems a transfer necessary.... Musgrave has been denied access to special training because she is assigned to the jail and she has been denied the opportunity to apply for a position outside of the jail because she lacks the special training."
 
 
 27
 13) "This court has great respect for much of the work done by Sheriff Heffron during his long career. Nevertheless, the court is persuaded that the circumstances presented in this case cannot be explained without some reference to sex bias." Moreover, "plaintiffs have established by a preponderance of the evidence that a sex bias against females has had a definite impact on the sheriff's department's conduct regarding intradepartment transfers."
 
 
 28
 We also summarize the district court's conclusions of law:
 
 
 29
 1) "[P]laintiffs' counsel indicated that this case should proceed solely on a claim of intentional sex discrimination. Though the trial did not always appear to go forward solely on the basis of an intentional discrimination theory, the conclusions of law reached in this opinion will be limited to disparate treatment analysis." (Footnote omitted.)
 
 
 30
 2) "Musgrave has failed to make this [McDonnell Douglas v. Green, 411 U.S. 792, 801, 93 S.Ct. 1817, 1823-24, 36 L.Ed.2d 668 (1973) ] showing.... [And, in any event,] the four part McDonnell Douglas test is inapplicable to Musgrave's claims." (Footnote omitted.)
 
 
 31
 3) "[P]laintiffs had made a prima facie case on the claims which survived [defendants' Rule 41(b) motion]."
 
 
 32
 4) The two career ladder policy is, "if it exists at all, a post hoc rationalization designed to prevent the transfer of female corrections deputies to the road patrol."
 
 
 33
 5) "[T]he defendants have failed to meet their burden of proof" of "articulating some legitimate, nondiscriminatory reason for the refusal to transfer Musgrave, McDonnell Douglas, 411 U.S. at 802, [93 S.Ct. at 1824]."
 
 
 34
 6) "This court's finding that the two career ladder policy was chimerical (at least until 1979) is a finding regarding the existence of the rule, and not regarding the rule's merit." The court also allowed the Sheriff to implement, prospectively, such a policy--in writing.
 
 
 35
 7) "Consideration of the statistics regarding the distribution of female deputies and the total lack of female supervisory personnel leads to the conclusion that Musgrave is not the sole victim of discrimination within the department."
 
 
 36
 8) "Thus, this court concludes that plaintiffs have established by a preponderance of the evidence that the department has discriminated against female deputies hired after July 1, 1975 on the basis of their sex."
 
 
 37
 9) "[T]his court concludes that an award of compensatory damages is not warranted in this case." (Footnote omitted.)
 
 
 38
 10) "[R]elief in the form of a judicially created affirmative action plan, or reinstatement of the county's former affirmative action plan, is unwarranted."
 
 
 39
 Sheriff Heffron appealed from the district court's order; plaintiffs cross-appealed, contesting both the continued requirement of agility tests for road patrol duty and a subsequent district court holding that a "career ladder policy" had been established by the sheriff's written submission to this effect. In addition, plaintiffs appeal from the failure to award compensatory damages or reimbursement to Musgrave, and from the court's failure to institute an affirmative action plan.
 
 II.
 
 40
 In reviewing this case, we must decide which theory of sex discrimination analysis we must be guided by. Then, we must determine whether the district court's various findings of fact and conclusions of law are erroneous. We begin by noting that we are required to accept the district court's findings of fact if they are not clearly erroneous;[5] conclusions of law, however, are fully reviewable.
 
 
 41
 Sex discrimination cases are properly analyzed according to one or more "theories". Two theories are arguably applicable to this case: "disparate treatment" and "disparate impact".[6]
 
 
 42
 In disparate treatment cases, a tripartite analysis is applied, with the burden of proof remaining on the plaintiff at all times: (1) the plaintiff must establish a prima facie case of discrimination, (2) the employer must offer evidence of a legitimate, nondiscriminatory reason for its actions, and (3) the plaintiff must prove that the reason offered is in fact a pretext for intentional discrimination. B. Schlei, supra note 6, at 1286-87; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (tripartite analysis); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256-58, 101 S.Ct. 1089, 1095-96, 67 L.Ed.2d 207 (1981) (same; burden of proof always on plaintiff).
 
 
 43
 In disparate (adverse) impact cases, the burden of proof shifts between the parties, starting with the plaintiff, and a somewhat similar tripartite analysis is employed: (1) the plaintiff must establish a substantial adverse impact on a protected class, (2) the employer must prove a business necessity for the practice (e.g., job-relatedness of the challenged requirement), and (3) the plaintiff must then prove that other acceptable requirements with less adverse impact exist. B. Schlei, supra note 6, at 1287; Griggs v. Duke Power, 401 U.S. 424, 429-30, 91 S.Ct. 849, 852-53, 28 L.Ed.2d 158 (1971) (tripartite analysis); Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (burden shifts).
 
 
 44
 When proceeding under a disparate treatment theory, the case usually focuses on an individual, "and the focus of the contest is on the employer's motivation for the different action taken, with the plaintiff attempting to prove intentional bias and the employer contending that its actions were based on a legitimate, nondiscriminatory reason." B. Schlei, supra note 6, at 1286. In adverse impact cases, there "is an attack on a specific [facially neutral] employment practice, such as a written scored test, or a specific objective requirement, such as a high school diploma requirement or a height and weight requirement." Id. at 1287 (footnotes omitted). See Rowe v. Cleveland Pneumatic Co., 690 F.2d 88, 92-93 (6th Cir.1982) (per curiam) (discussing the two theories, stating that either or both can be pleaded and proved, noting that purely subjective rehiring decisions will be "carefully scrutinized in order to prevent abuse", and detailing the requisites of proof under each theory); Chrisner v. Complete Auto Transit, Inc., 645 F.2d 1251, 1257-59 (6th Cir.1981) (discussing generally the two theories and applying a disparate impact analysis to a failure to hire situation).
 
 
 45
 The focus of proof and the point of plaintiffs' case concerns the Sheriff's motivation for and claimed intentional discrimination against a single person (Musgrave) and the Sheriff's contention that there are legitimate, nondiscriminatory reasons for his actions. We believe, therefore, that the proper analysis is that of disparate treatment--the analysis the district court essentially applied.
 
 
 46
 The Supreme Court has stressed the importance of the ultimate question--whether the plaintiff established unlawful discrimination by a preponderance of the evidence--and down-played the significance of utilizing a rigid analysis heretofore discussed. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714-16, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983).
 
 III.
 
 47
 We now consider, in light of the above analysis, whether the district court properly found the ultimate fact: that defendant Sheriff Heffron intentionally discriminated against female deputies generally and Deputy Musgrave specifically.
 
 A.
 
 48
 We hold that the district court was clearly erroneous in concluding that Sheriff Heffron intentionally discriminated against females in general. On the facts in this record, we are left with the "definite and firm conviction" that the court's ultimate conclusion is incorrect. The district court's findings are inconsistent with the relief it granted. The court acknowledged that a seniority system was in effect in the department and that there was a bona fide reason for the transfer to road patrol of the only two corrections officers hired after July 1, 1975 (Hillen and VanderLaan). There was no other showing that any qualified female who had sought the transfer requested by Musgrave had been turned down by the defendant. There was a showing that all of the road patrol officers were male, but the only female applicant for a position on the road patrol (Fisher) had been granted a transfer. Thus, at the time the complaint was filed, assuming that the transfers of Hillen and VanderLaan were non-discriminatory and in light of the unchallenged seniority system, there had been no demonstrated denial of transfer to Musgrave or any other females to any existing opening. The district court so correctly found. Moreover, at the time of filing the complaint, the basis for relief sought for alleged sex discrimination was that Musgrave had requested a transfer to the road patrol in 1980 and in 1982 and had been refused. Plaintiffs asserted that defendant, in refusing the 1982 request, had indicated that "when a Road Patrol opening occurred it would be advertised", and they objected that this was a new "unheard of policy and would force Musgrave and others to compete against new applicants." This is part of an attack on the "two career ladder" policy allegedly adopted by the Sheriff. However, whether there was or was not a "two career ladder" policy was essentially immaterial with respect to transfer from the corrections division to the road patrol: those who were hired in the road patrol or who transferred to the road patrol (other than the two exceptions specified, which were found to have been transferred without any sex discrimination ramifications) were all senior to Musgrave.
 
 
 49
 Despite plaintiffs' allegations about transfers of males to road patrol without testing, there was no evidence of any such transfers (except, again, Hillen and VanderLaan, who were found to have been transferred in response to an urgent condition unrelated to sex discrimination). The only other basis of complaint was that Musgrave had been denied EMT training, which was provided to four males at no cost. The district court properly denied relief with respect to this latter assertion, however, because expenditures on EMT training were not required only of females; other male deputies, including deputies Hillen and VanderLann, were also required to obtain EMT training at personal expense. This fact belies any inference of generalized sex discrimination by the defendant.
 
 
 50
 Finally, with respect to the low percentage of females in the Sheriff's Department, the district court found that in the three and a half year period before the complaint was filed nearly 26% of the hires in the department were female.[7] This indicates that the Sheriff's policy was bringing a higher percentage of females into the department after 1979, and is inconsistent with a finding that defendant discriminates generally against females. We thus REVERSE the court's award of relief as unjustified under 42 U.S.C.A. Sec. 2000e-5(g).
 
 
 51
 In our view the written career ladder policy required by the district court after first declaring the Sheriff's declared policy void goes beyond the proper bounds of the district court's authority to direct the policies and practices of the Sheriff's department. A part of the policy in question was the provision that correction division deputies, who as of December 15, 1980, had not already obtained MLEOTC certification, would not be able to gain such certification through employment in corrections. The effect of such a policy would be to preclude transfer after December 15, 1985, from corrections to the road patrol, and other transfers except as provided in the collective bargaining agreement. While the district court may have had the duty to set aside a practice or policy found to be discriminatory in intent or effect under Title VII, there was no showing that any female was "similarly situated" to Patricia Musgrave or that another qualified and interested female was denied a transfer. Having decided to provide relief for Musgrave by directing her transfer, we conclude that the district court unduly and unnecessarily interfered with the operation of the Sheriff's Department by further requiring an over-all transfer policy which might well impact upon the rights of males, as well as females or other discrete groups. We therefore reverse the district court's mandate of a written general transfer policy and the court's sanctioning of the particular policy submitted by Sheriff Heffron. We leave it to the Sheriff and KCDSA (to the extent it is concerned and it is a proper subject of collective bargaining) to work out a transfer policy in the Sheriff's Department.
 
 
 52
 KCDSA on appeal seeks, among other things, to abolish agility testing for transferees to the road patrol, to set aside a sanctioned written career ladder policy, and to institute of an affirmative action policy that would favor females in the department. KCDSA asserts error in the district court's refusal to grant the kind of relief it seeks. With respect to agility testing, the principal contention is that Judge Miles "allowed the institution of such testing to begin with Plaintiff Musgrave and other officers found to have been denied the possibility of transfer because of sexual discrimination." The problem with KCDSA's contention in this respect is that there was no showing that other female officers (including Musgrave herself) were unable to pass the agility test, or that it was designed to discriminate against females. The test, of course, was to be applied to all applicants for transfer to the road patrol, not just females, and plaintiffs offered no proof that it would prevent a disproporationate number of females from transferring. We find no error, therefore, in the district court's action on agility testing.[8]
 
 
 53
 Because there is no showing of sex discrimination generally, the district court had no basis for requiring a written transfer policy to be court approved. The Sheriff and KCDSA are free to bargain about a transfer policy which would not be discriminatory either in intent or in effect.
 
 
 54
 Finally, KCDSA favored a "court ordered affirmative action plan" in the district court. The district court declined to mandate anything beyond the injunction that the Sheriff not discriminate against females in respect to hiring, transfers, training, and promotions. KCDSA was a party to earlier litigation seeking affirmative action relief for females, wherein a settlement was reached. The Sheriff agreed to abide by an affirmative action policy adopted by the County Board in 1975 and revised in 1977. KCDSA has standing to pursue the carrying out of an affirmative action policy to advance and enhance legitimately the employment opportunities of females in accordance with that settlement, but because there is no basis upon which to find that the Sheriff discriminated in this record, there is no basis for action on a further affirmative action plan at this time.
 
 B.
 
 55
 There was no proof of a policy of denying the request of an eligible and qualified female corrections officer to transfer to the road patrol from corrections, and it is undisputed that at the time of Musgrave's request there was no opening in the road patrol to which she was qualified to transfer. Nonetheless, the district court found that Musgrave made out a prima facie case of sex discrimination in the denial of her request for a transfer. The court also found that the reasons given for the denial were pretextual and lacked a sufficiently justifiable business purpose.
 
 
 56
 It is a close question as to whether Musgrave made out a prima facie case, and whether the Sheriff set forth a justifiable basis for refusing Musgrave's transfer requests, or that the Sheriff's reasons, to the extent they justify his actions, were not pretextual. In this respect, we note that there was underlying statistical and other evidence including the Sheriff's markedly different responses to Musgrave's and a male deputy's (Fairbrothers') transfer requests to support the district court's conclusion. Thus, we hold that the district court's ultimate conclusion that Sheriff Heffron had intentionally discriminated against Musgrave specifically is not clearly erroneous.
 
 
 57
 The district court remedied its finding of discrimination against Musgrave by ordering the Sheriff to transfer her to one of the two positions available at the close of the trial. In light of our decision that the district court did not err in finding discrimination, this relief was a proper remedy under section 2000e-5(g), 42 U.S.C.A. However, the district court went further; it directed that the most senior, interested (male) deputy should also be transferred to the road patrol and that the remaining, interested corrections deputies be placed on a seniority list for future transfer. We believe this additional action was erroneous and went beyond the proper bounds of a remedial action for sex discrimination against females.
 
 
 58
 We have previously found that the Sheriff did not discriminate generally against females; moreover, there was no evidence and no evidentiary showing that giving corrections deputies priority for road patrol openings in accordance with an established seniority policy would bring about greater female participation in the road patrol than if outside qualified persons, including females, were permitted to apply and be considered for road patrol openings. We are not made aware of other female corrections deputies interested in transferring to the road patrol. Also, when the first two road patrol openings came about in March of 1984, the Sheriff selected a female and a male from outside the department. The net effect was to bring about one female in road patrol, whether or not it was Musgrave.
 
 
 59
 We conclude by addressing two questions concerning Musgrave's requests for further relief: whether she is entitled to reimbursement for tuition expenses incurred in obtaining EMT-III training and whether she is entitled to back pay. The district court denied relief on both requests. It denied reimbursement because Musgrave was treated the same as male deputies--they had to pay their tuition expenses; it denied back pay presumably because the pay scales for corrections and peacekeeping are similar and Musgrave, having been employed in corrections all the while, was not denied any additional compensation. We find no basis for finding the district court's decisions in these particulars to be in error, and we affirm this portion of the court's decision.
 
 IV.
 
 60
 The district court's decision is AFFIRMED in part, REVERSED in part, and REMANDED in accordance with this opinion.
 
 
 
 [1]
 Plaintiff is now Patricia Musgrave Skelnoc. She is referred to herein as Musgrave. All defendants but Sheriff Heffron have been dismissed
 
 
 [2]
 Only road patrol officers with emergency medical certification are qualified to staff the emergency medical vehicles
 
 
 [3]
 Whether a two career ladder policy existed, however, is highly disputed. The district court found no such policy until after plaintiff Musgrave attempted to transfer from corrections to the road patrol
 
 
 [4]
 Throughout trial, however, no similarly situated female deputies were identified. The plaintiffs admitted that Musgrave was the only female known to apply unsuccessfully for a road patrol position. (Connie Fisher had been successful in her request.) There had been no openings in the emergency vehicle positions at the time the complaint was filed
 
 
 [5]
 See Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985):
 Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is that set forth in Federal Rule of Civil Procedure 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." ...
 Although the meaning of the phrase "clearly erroneous" is not immediately apparent, ... "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.
 
 
 [6]
 The differences between disparate treatment and disparate (adverse) impact, along with their variants, are summarized well in B. Schlei & P. Grossman, Employment Discrimination Law ch. 36, at 1286-90 (2d ed. 1983). Other theories, such as sexual harassment of the "quid pro quo " or "offensive work environment" type, are simply not appropriate and we do not discuss them. See, respectively, Highlander v. K.F.C. National Management Co., 805 F.2d 644 (6th Cir.1986), and Rabidue v. Osceola Refining Co., 805 F.2d 611 (6th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987)
 
 
 [7]
 Plaintiffs' appellate brief noted that "the available labor pool in the Grand Rapids area" of those "receiving Associates Degrees in the Criminal Justice area" was 29% female
 
 
 [8]
 This ruling would not preclude a future challenge, based upon proper evidence, if it were asserted that agility testing had a disparate impact on a discrete class, such as females. Plaintiffs concede in their brief that "it appeared that Musgrave could easily pass the test."