### Cheryl L. KIRKLAND

v.

### Gus C. BRINIAS and Jim Regas, d/b/a The Original Louis Drive–In Restaurant.

### and

### Billie Jean LaRUE

v.

### Gus C. BRINIAS and Jim Regas, d/b/a The Original Louis Drive–In Restaurant.

### Nos. CIV–3–87–417, CIV–3–87–418.

United States District Court,
E.D. Tennessee,
N.D.

Aug. 28, 1989.

---

W.P. Boone Dougherty, Knoxville, Tenn., for plaintiffs.

Joseph J. Levitt, Jr., Knoxville, Tenn., for defendants.

## MEMORANDUM OPINION

HULL, Chief Judge.

These actions for sexual harassment in the workplace, brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, came before the Court for trial, without intervention of a jury, on May 17, July 26, and July 27, 1989. Plaintiffs Cheryl L. Kirkland and Billie Jean LaRue both formerly worked as waitresses at The Original Louis' Drive–In Restaurant (Louis'). Both claim that due to the unwelcome sexual advances, propositions, threats, and physical contacts of a busboy named Ali Hijer, which were condoned and encouraged by the restaurant's owners, the working conditions at Louis' were offensive and intimidating. Both sought compensation in terms of back pay.

Title VII case law has recognized two basic variants of sexual harassment: harassment that creates an offensive environment and harassment in which a supervisor demands sexual consideration in exchange for job benefits. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618 (6th Cir.1986). All of the claims at issue in this case fall into the first category. As the Court understands the *Rabidue* case, in order to prevail in their claim, plaintiffs Kirkland and LaRue have the burden of proving: (1) that they were subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) that the harassment complained of was based on sex; (3) that this harassment had the effect of unreasonably interfering with their work performance and creating an intimidating, hostile, or offensive working environment that af-

fected seriously their psychological well being; and, (4) that their employers either knew or should have known of the sexual harassment and failed to implement prompt and appropriate corrective action. Moreover, in order to accord appropriate protection to both plaintiffs and defendants in a hostile work environment case, the trier of fact, when judging the totality of the circumstances, must adopt the perspective of a "reasonable person" reacting to a similar environment under essentially similar circumstances. *Rabidue*, 805 F.2d at 619–621.

■ The first step in establishing a claim based on offensive working conditions requires proof of unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature.

Plaintiff LaRue testified that Mr. Hijer offered her $100.00 for sex; that after she had made it clear that she was a married woman and unavailable to him, he often whispered to her his desire to go to bed with her "for six months"; that at one time, when he apparently incorrectly believed she had accused him of stealing tips, he pointed his finger in her face, spoke to her in angry and threatening words, grabbed her painfully by the arm, and did not release her until Jeff Foster, the cook, broke up the encounter. She testified that, after that event, he started surreptitiously patting her on her rear end to annoy her; that he would do this and then run away laughing; that he spitefully persisted in this behavior long after she had instructed him to keep his hands off her; that he would come up behind her and snap her bra; that he was unwilling to take any instruction from women; that on two occasions threatened to kill her when she had asked him to do something such as clear a table or wipe off some chairs; and that he got into a physical fight with her on the day she quit because she had asked him to take the chairs down off the tables to have the restaurant ready for opening. On that final day, she testified that Mr. Hijer got very angry at her request; accused her of lying; backed her up while poking his finger in her face; grabbed her arm, causing her to drop a plate of lemons she had cut up for the day's tea; and kicked her in the shins when she slapped his face. Allegedly, this entire incident was played out in the full view of defendant Regas, who took no steps to protect her, showed no concern for her injury, and them blamed her for "picking on Ali."

Plaintiff Kirkland's testimony was very similar. She too was offered $100.00 for sex; she also found Mr. Hijer unreasonably angry and threatening when asked to do routine, work-related jobs; and she too was subjected to apparently hostile pranks (or misguided playfulness) such as hiding her tips among the sugar packets. She also testified of unwelcome hugs and pats, and being constantly asked by Ali to try to get him the telephone numbers of attractive female customers.

Other former employees corroborated the plaintiffs' accounts. Waitress Beth Keller was also offered money for sex by Mr. Hijer. Waitress Betty Beal and cashier Shirley Dunn were both threatened with death after asking Mr. Hijer to clear tables. The Court is satisfied that unwelcome sexual advances, requests for sexual favors, and verbal and physical conduct of a kind likely to be offensive to any reasonable person working under similar circumstances, was at least occasionally a problem for women working at Louis' who came in contact with Mr. Hijer.

As indicated earlier, *Rabidue* requires that the plaintiffs prove that the harassment in question had the effect of unreasonably interfering with their work performance and creating an intimidating, hostile, or offensive working environment that seriously affected their psychological well being. Neither plaintiff testified to any psychological damage caused by their employment or that they were unable to carry on their work. Both waitresses were married women with years of waitressing experience who were quite able to take care of themselves. Both however, testified emphatically about their general outrage not only at Mr. Hijer's conduct, but at the insensitivity of the defendants themselves.

While it is clear that both plaintiffs would have been better able to cope with Mr. Hijer's unwelcome conduct if they had felt that their personal dignity was respected and protected by the management, neither plaintiff proved any actual damages as a result of Mr. Hijer's behavior. Neither established a causal connection between the back pay being claimed and the sexual harassment.

*Rabidue* also requires that the employers, if they are to be held liable, must have known of the harassment, or reasonably should have known about it, and failed to take prompt and appropriate corrective action.

Neither plaintiff expressly complained of sexual harassment to their employers, but neither believed that the defendants would be sympathetic. Both felt that the defendants were fully aware of what was going on in the restaurant and were amused by it. Former busboy Mark Pinsley testified that Mr. Hijer's harassment of the waitresses was on "a day to day basis" and that it was hard not to notice. It was his impression that defendant Regas was aware of it all. ["There wasn't a whole lot going on that Jimmy didn't know about."] He specifically remembered seeing Mr. Hijer come up behind Mrs. Kirkland, push her up against the ice machine, and put his hands on her breasts. ["She went hysterical."]. He and several other witnesses also remember occasions when dishwasher Nancy Whittaker would scream at Mr. Hijer to keep his hands off her and that she could be heard all over the restaurant.

Mrs. LaRue testified that Mr. Regas was present the first time Mr. Hijer patted her on the rear; that she specifically told him not to do it again; and that she asked Mr. Regas to tell Ali to keep his hands off her. She says that Mr. Regas responded with "a silly grin;" did not reprimand Mr. Hijer; but started calling him "rooster" after that incident.

Mrs. LaRue, Betty Beal, and Shirley Dunn each testified that they reported to Mr. Regas the first time Mr. Hijer threatened to kill them. Penny Pate reported this to both managers and they acted as if they hadn't heard her. Shirley Dunn testified that Mr. Regas just walked away when she spoke to him. Betty Beal said that Mr. Regas simply said he would talk to Gus (Mr. Brinias) about it. None of the witnesses believed that any attempt was ever made to correct Mr. Hijer's threatening behavior.

Mrs. LaRue also testified that she told Mr. Brinias that Ali was pestering certain female customers, trying to go out with them, but that he simply ignored her and just walked off. Mrs. Kirkland testified that she told Mr. Regas that Mr. Hijer was trying to get the customers' telephone numbers. She claims that he responded, "Why don't you just give him [Ali] a little —he's horney." Beth Keller overheard this remark as did Betty Beal, who testified that Mrs. Kirkland was "visibly upset."

The defendants' first witness was Gus Ligdis, who apparently worked as an assistant manager of Louis' during some of Mrs. LaRue's tenure there although he did not overlap with plaintiff Kirkland. He testified as an eye witness to the scuffle between Mrs. LaRue and Ali, indicating that when he separated them, Ali was bleeding from his mouth. He said that Mrs. LaRue assumed she would be fired; said things like "I guess you're going to take up for him," and quit before the management even had time to investigate the incident. He also testified that no employee ever complained to him about improper sexual conduct on Mr. Hijer's part and that, if they had, Ali would have been fired on the spot. He claimed that he was unaware of Mr. Hijer's requests for sexual favors from the waitresses until this lawsuit was filed. Mr. Ligdis' testimony was helpful in establishing that much of the difficulty experienced by the waitresses as Louis' was a matter of cultural misunderstandings. Both defendants Regas and Brinias, and Mr. Ligdis himself, had come to the United States from Greece (one by way of Canada first) as young men in their twenties, speaking no English, and having very little education. Although they were all now men in their 50's, American citizens, and well established in the restaurant

business, they were still very much Greeks. There were obvious linguistic and cultural differences between them and the local women they hired as waitresses. Mr. Hijer was a man in his 50's who had very recently immigrated from Amman, Jordan. His English was exceedingly limited and he was having difficulty making his way in a new culture. Both defendants were sympathetic to his plight and trying to help him out. Undoubtedly, they often did instruct the other employees to "Quit picking on Ali." However, Mr. Ligdis did not consider either defendant to have been unfair to their employees or unwilling to listen to their complaints and problems.

The defendant's second witness, Jeffrey Foster, was the cook Mrs. LaRue testified about who had interceded to make Mr. Hijer to let go of her arm. He remembered having to ask Ali to let go of Mrs. LaRue and telling him to leave her alone. He did not remember witnessing any improper sexual touching on Ali's part but testified that he had a way of grabbing a person's arm (both men and women) and holding them in his presence while he struggled to communicate whatever he had to say to them. He had heard rumors that Ali was bothering waitresses and asking them for sexual favors in exchange for money. He testified that Mrs. LaRue did not like Mr. Hijer and called him an "Iranian motherfucker." It was his impression that the defendants would have listened if the plaintiffs had complained about improper sexual conduct.

Witness Mary Kathleen Sharp worked at Louis' when both plaintiffs Kirkland and LaRue were there and during the time of Mr. Hijer's employment. She testified that she never had any problems with Ali and was unaware that he had ever offered money to any of the waitresses in exchange for sex. She never witnessed any improper touching on his part and did not believe he would steal tips. She also testified that Mrs. LaRue did not like Mr. Hijer and called him names. She believed both defendants would be willing to listen to employees' problems and help them out if they were being harassed.

Nancy Whittaker, a long-time kitchen employee at Louis' (and the one who supposedly could be heard all over the restaurant yelling at Ali to keep his hands off her), also testified for the defendants. She admitted that when Ali first came to work he would take her by the arm when he talked to her and she had to tell him not to do this. She testified that a lot of people had trouble getting along with Ali because they couldn't understand him. Plaintiff LaRue would call him a "son-of-a-bitch foreigner." She also testified that when he first came, Ali couldn't do his job too well, did not understand what the waitresses wanted him to do, and generally had a hard time. However, "He was doing the best he could." She had a different explanation for why Mr. Hijer was called "rooster" (it arose out of a linguistic misunderstanding when he was sent to the kitchen to get some chicken) and another explanation for why Mr. Hijer was offering some of the waitresses $100.00. (He was trying to rent a room and could pay that amount per month for a place to live.) She testified that both defendants were accessible to employees and would listen to their problems.

Kathy Sue Blizzard had worked with Ali. They both came in early, before the restaurant was open, to do food preparation. She had not been afraid to be alone in the place with him; was never propositioned for sex; and never experienced any improper sexual touching. She remembered that neither Mrs. Kirkland nor Mrs. LaRue liked Ali. She considers her employers to be approachable and willing to work out problems between employees. They helped her out when she was having trouble with an employee named Eddie.

Employee Ann Dayspring was never offered money by Ali and was never subjected to any improper sexual conduct. She considered defendant Regas unresponsive to employees but that Mr. Brinias was always willing to listen.

Former employee Darlynn Rhoades also worked with Ali without experiencing any problems. She worked as a cashier and, on occasion, had to give him instructions such

as to move certain tables together for larger parties. Sometimes he would pretend not to understand what she wanted. She remembers that Mrs. LaRue and Mr. Hijer were "always at each other." It was her impression that Mr. Hijer was not used to having women tell him what to do and that the waitresses were insensitive to this and did not know how to handle him. She felt that both her employers were accessible and would listen to an employee's problems.

Ali Hijer also witnessed for the defendants. His language problems were evident. For example, despite the fact that he had now been in this country eight years, and that he has worked almost exclusively in the restaurant business, he did not know the word "waitress." The word "sex" was misinterpreted as "six (6)". When asked if he had offered any of the waitresses at Louis' $100.00 to go to bed with him, he protested that that would have been impossible on his salary; he was too old for such things (now 58); that he had a wife and thirteen children, *etc.* He denied ever trying to rent a room from anybody at Louis' for $100.00. He emphatically and emotionally denied ever improperly touching any woman. He was very upset that one of the plaintiffs had accused him of stealing tips and twice recounted to the Court an incident in which he had found $17.00 (apparently lost by a patron) and turned it over to the management. He was very upset about the fight with plaintiff LaRue and explained to the Court that in Arabia, a woman would never hit a man. He had not known how to handle her attack. The Court noted that Mr. Hijer was about 5'5" tall and weighed about 140 pounds. He was obviously smaller than Mrs. LaRue.

Former employee Donna Ballew testified that she was aware that some of the waitresses had been offered money for sex by Mr. Hijer. "Everybody picked on Ali." He got his feelings hurt a lot. The plaintiffs did not like him and would call him "bad things." She never took any personal problems to the management but believed that she could. "Jimmy (Mr. Regas) was as gentle as a puppy."

Defendant Jimmy Regas told about coming to the United States and eventually purchasing his uncle Louis' restaurant business. With regard to plaintiff Kirkland, he described several incidents when he had helped her out with personal problems and pointed out that he had not fired her even after one incident when she had referred to a customer as a son-of-a-bitch under circumstances where other patrons could hear her. He denied ever witnessing any improper sexual conduct on Ali's part; denied ever pushing Mrs. Kirkland into the Coke machine; and had no recollection of her ever reporting to him that Ali was bothering any customers. He testified that Mrs. Kirkland would, on occasion, complain to him about Ali's work and that he would always check on the situation. He pointed out that neither plaintiff had been fired and that Mrs. LaRue quit after the fight with Ali before he had even had a chance to find out what the problem was between them. He denied that any waitress ever complained to him that Ali was offering them money for sex.

Mr. Brinias admitted hearing indirectly that Ali had offered money to some of the waitresses but testified that, unless someone actually came to him with a complaint, he would not investigate such a rumor. As far as he knew, the waitresses were considering it a joke and nobody had taken offense. He testified that in the hustle of the restaurant business there was always bumping, jostling, and friction between employees and that the management let the employees sort out their own problems unless somebody specifically requested that they intercede. He remembered that Mrs. LaRue had complained to him about Ali but that it was always with regard to the way he did (or failed to do) his work. Neither she nor any other waitress ever complained of sexual harassment. He pointed out that even in Mrs. Kirkland's long letter to him about her grievances with Louis' restaurant, she had not informed him that she's ever experienced any sexual harassment. He and Mr. Regas had been advised that Ali had bothered a customer and had investigated the report. While he had heard that Ali had propositioned Beth Keller, he could not believe he would ever have propo-

sitioned Mrs. LaRue or Mrs. Kirkland. "He told me he wouldn't even spit on them." However, he indicated that if either of them had been sexually harassed or offended by Mr. Hijer's conduct, and had come to him for help, he would have taken the complaint seriously and immediately investigated the charge.

After carefully weighing all of the proof, the Court finds in favor of the defendants. There is no question that the plaintiffs, and some of the other waitresses at Louis', were subjected to sexual harassment on the job. However, unlike the situation in the typical harassment case, the unwelcome behavior came from a subordinate, not a supervisor. And while the Court finds that some misconduct was of a sexually offensive nature, that would create a hostile and intimidating working environment for a reasonable person under those circumstances, there is no hint that it had any harmful psychological effect on the plaintiffs. Both plaintiffs quit their jobs because they felt that their employers were unwilling to listen to their side of an issue when they felt unjustly accused of something. Neither quit as a direct result of any overtly sexual conduct. In fact, plaintiff Kirkland wrote defendant Brinias a twelve-page letter after her resignation in which she catalogued her many grievances against her former employers. These included lack of vacation pay, lack of maternity leave, false accusations, *etc.*, but did not mention sexual harassment. In fact, the evidence was overwhelming that both plaintiffs were well able to handle the situation; that they were both capable, outspoken women; and that, if they had needed help from the management, they would not have hesitated to ask for it. Finally, evidence that the defendant employers recognized, or should have recognized, that any of their employees found Mr. Hijer's conduct sexually offensive, did not preponderate in favor of the plaintiffs.

Accordingly, judgment will enter on behalf of the defendants and the plaintiffs will take nothing on their claim.