Denise A. **DORRICOTT**, Plaintiff,

v.

**FAIRHILL CENTER FOR AGING,**
**et al., Defendants.**

No. 1:97–CV–1373.

United States District Court,
N.D. Ohio,
Eastern Division.

April 21, 1998.

Beverly Ann Caley, Savren & Caley, Cleveland, OH, for Plaintiff.

Richard C. Haber, Reminger & Reminger, Cleveland, OH, Mark D. Katz, Thomas H. Barnard, John A. Hnat, Ulmer & Berne, Cleveland, OH, for Defendants.

## OPINION AND ORDER

GWIN, District Judge.

On February 23, 1998, Defendants Fairhill Center for Aging, et al. ("Fairhill") filed a motion for summary judgement against Plaintiff Denise A. Dorricott [Doc. 24]. In their motion, Defendants seek judgment on all claims in the complaint [Doc. 1].[1] Plaintiff Dorricott sues Defendants Fairhill, her former employer, for sexual harassment and retaliatory discharge from her job. For the reasons that follow, defendants' motion for summary judgment is granted in part, and denied in part.

### I. Facts

From June 5, 1996 to November 26, 1996, Plaintiff Denise Dorricott was employed by Defendant Fairhill Center as a Chef–Manager of the Center's food service facility. During the course of her employment, Dorricott alleges that James Tillman ("Tillman"), a temporary security guard employed by the Center at the time, repeatedly made sexual comments and advances toward her. Although Plaintiff Dorricott did not immediately report all occasions of verbal harassment as directed by the Center's employment and policy manual, she did report several inci-

---

**1.** On June 12, 1997, Defendants Fairhill filed a partial motion to dismiss Counts IV, V, VI and VII of Plaintiff Dorricott's complaint [Doc. 4]. Since then, Dorricott voluntarily dismissed her claim under Count V for violations of the Family and Medical Leave Act. Accordingly, the Court limits its review to the remaining claims (Counts I, II, III, IV, VI and VII). Because Defendants Fairhill have incorporated arguments in support of their June 12, 1997 motion to dismiss into the present motion for summary judgment, the Court's order herein encompasses the motion to dismiss.

dents, including alleged unwelcome physical contact by Tillman in October of 1996.

On October 26, 1996, Plaintiff Dorricott filed a verbal complaint with her immediate supervisor, co-defendant Dr. Stephanie Fallcreek ("Fallcreek"), that Tillman had earlier that day allegedly grabbed or pinched the plaintiff's breast while she was carrying a tray of ice. Fallcreek instructed Dorricott to meet with Lt. Shirley Newton–Jones, the Center's director of security, to formerly report the incident. Dorricott did so, filing a written report with Lt. Newton–Jones on or near October 31, 1996. On or near October 30, 1996, Plaintiff Dorricott also reported to Mr. Robert Skeist, the Center's associate director, a series of other alleged incidents of verbal and physical assaults toward her by Tillman.

Shortly after making her complaint to Fallcreek, Plaintiff Dorricott says she began receiving negative memoranda from Fallcreek concerning poor job performance.[2] Dorricott says that this negative feedback was inconsistent with her prior work performance. In this regard, the plaintiff alleges that prior to the date she made her complaint about Tillman's behavior, she had received only one corrective performance memo from Fallcreek regarding her time card.

After receiving Plaintiff Dorricott's written complaint of the physical incident involving Tillman, Fallcreek directed Lt. Newman–Jones to start an investigation. This investigation began on or near October 31. The date the investigation was completed is disputed. On December 3, 1996, Lt. Newman–Jones made a final report to Fallcreek. In the report, Lt. Newman–Jones assesses the incidents between Dorricott and Tillman as being consensual "horseplay" and "teasing" by both parties. Plaintiff Dorricott says the results of the investigation were never shared or discussed with her.

Plaintiff Dorricott contends that she suffered significant emotional distress as a result of the alleged sexual harassment and corresponding negative performance memos. Dorricott exhausted her medical leave in November of 1996, yet requested additional time. On November 21, 1996, Lyle Gleason, the Center's business manager, wrote Dorricott informing her that if she did not return to work, she would be considered a voluntary quit. On November 26, 1996, Dorricott received written notice from Gleason terminating her employment with the Fairhill Center.

Plaintiff Dorricott now sues Defendants Fairhill and Fallcreek alleging that her termination was in retaliation for reporting Tillman's sexual harassment and assault and for filing a formal charge of retaliation with the EEOC and the OCRC.

## II. Claims

Defendants Fairhill seek summary judgment on Counts I–IV, VI and VII, of the complaint. These claims are as follows: (I) gender discrimination violating Title VII of the Civil Rights Act of 1964; (II) gender discrimination violating the Ohio Civil Rights Act; (III) retaliation violating Title VII and the Ohio Civil Rights Act; (IV) tortious interference with a contractual relationship; (VI) wrongful discharge in violation of public policy; and (VII) defamation.

## III. Discussion

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through

---

**2.** Plaintiff Dorricott refers to one primary memorandum dated October 26, 1996, in which Fallcreek outlines nine (9) deficiencies in Dorricott's job performance. There appear to be at least two versions of this memo. One version, identified as Defendants' Exhibit P, is drafted on plain paper and filed stamped October 29, 1996. The other version, identified as Plaintiff's Exhibit 5, is drafted on Fairhill letterhead and was the memo Dorricott received on October 28, 1996. Both versions are typed and both are initialed by Fairhill.

competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections,* 141 F.3d 252, 256 (6th Cir.1998).

### A. Sexual Harassment Claims

Defendants Fairhill first seek judgment on Plaintiff Dorricott's claims for sexual harassment under Title VII and state law (Counts I and II). Defendants say they are entitled to judgment because Dorricott fails to show the alleged incidents of sexual harassment by Mr. Tillman unreasonably interfered with her work performance or otherwise created a hostile work environment. Defendants also argue that, for purposes of employer liability, Dorricott is unable to show Defendants Fairhill failed to take prompt and effective corrective action in response to Dorricott's complaints.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. Indeed, the statute grants employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* 477 U.S. at 65.

However, the Court emphasized in *Meritor* that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by the statute. See *id.* at 67. Rather, harassment must affect a "term, condition, or privilege" of employment in order for it to fall within Title VII's purview. Thus, for alleged harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed this standard and elaborated upon its contours. The *Harris* Court explained that the conduct in question must be judged by both an objective and a subjective standard. "The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* at 21–22, 114 S.Ct. 367. "This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at 21. The Court explained that all of the circumstances should be considered, and it suggested a non-exhaustive list of relevant factors. These include:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23. The Sixth Circuit has followed the Supreme Court's direction in this regard. See *Blankenship v. Parke Care Ctrs., Inc.,* 123 F.3d 868, 872 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825–26 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 834 (6th Cir.1996).

The Sixth Circuit has also clearly stated its position regarding the standard to be used when reviewing cases of work-place harassment between co-employees, as in the case at hand. In *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868 (6th Cir.1997), the Sixth Circuit outlined five elements a plaintiff must show to state a claim for sexual harass-

ment. A plaintiff must show (1) she is a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based upon her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer "knew or should have known" of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* at 872. See also *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir.1996) (quoting *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618–19 (6th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987)).

The law governing employer liability where incidents of co-employee harassment have been reported to management is well-established in the Sixth Circuit. "When a plaintiff alleges harassment by co-workers, we have defined the test as whether the employer 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'" *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir.1996) (quoting *Rabidue,* supra, at 621). This test has come to be known as the *Rabidue* standard.

As outlined in *Blankenship,* supra, at 872–73, the *Rabidue* standard has two parts: (1) whether the employer "knew or should have known" of the alleged harassment; and (2) whether the employer "failed to implement prompt and appropriate corrective action." *Id.* The first prong of the standard places a duty on the employer to have an awareness of its work environment. In essence, this requirement prevents an employer from raising a defense of "negligent ignorance" to the existence of harassment. *Id.* at 873. The second prong places a duty on the employer to take steps to correct harassment that in knows about. Corrective action is that action which is "reasonably calculated to end the harassment." *Id.* at 872 (citation omitted). An employer will only be liable if "its response manifest an indifference or unreasonableness in light of the facts the employer knew or should have known." *Id.* at 873.

■ In the instant case, Plaintiff Dorricott gives testimony that she did not report most of Tillman's verbal and physical harassment to Fairhill management personnel because

she felt she could handled it herself. Although she was aware of the Center's procedure's for making such complaints, Dorricott gives no other reason why she elected not to report the harassment using appropriate channels. Where the Center was not informed of the harassment, this Court cannot find the Center liable for failure to take action on matters it knew nothing about. Absent some evidence showing the Center's management was made aware of the alleged sexual harassment, Dorricott's claim for sexual harassment concerning Tillman's *unreported* verbal and physical harassment must fail.

■ As to the verbal and physical harassment that Dorricott did report to Fairhill management, specifically the incident where Tillman allegedly grabbed her breast, the Court likewise finds that Dorricott fails to give sufficient evidence of employer bad faith or indifference as required under the Sixth Circuit standard. First, Plaintiff Dorricott fails to show evidence that Defendants Fairhill acted unreasonably, given their limited knowledge of the facts as and when disclosed to them by Dorricott. Plaintiff Dorricott further fails to give evidence that once informed of the harassment, Fairhill failed to take appropriate corrective action. In this regard, the Court finds that Dr. Fallcreek's direction to Dorricott to make a written report with Lt. Newman–Jones was consistent with established company policy governing these types of complaints. Lt. Newman–Jones's immediate investigation of the alleged harassment also evidences Fairhill's good faith effort to end the harassment.

Because Plaintiff Dorricott fails to give sufficient evidence showing that Defendants Fairhill actually knew or were made aware of incidents of sexual harassment within the workplace and failed to act, and because she fails to show that Defendants Fairhill did not implement prompt and appropriate corrective action, Plaintiff Dorricott's claims for sexual harassment under Title VII and state law, fail. Accordingly, the Court grants Fairhill's motion for summary judgment on Counts I and II of the complaint.

## B. Retaliation Claim

■ Defendants Fairhill next say Plaintiff Dorricott's claim for retaliation (Count III) fails because Dorricott is unable to give evidence that defendants terminated her for discriminatory reasons. In this regard, defendants say the record is replete with non-discriminatory reasons supporting Defendants Fairhill's decision to terminate her. These include Dorricott's inability to "co-exist" in the Fairhill environment due to poor interpersonal skills, her failure to meet job performance expectations such as deficiencies in her record keeping, her failure to maintain clean and secure work areas, and excessive absenteeism.

To establish a *prima facie* case for retaliation under Title VII or, alternatively, Ohio Rev.Code § 4112.02(A), a plaintiff must demonstrate that: "(1) she engaged in protected activity; (2) an adverse employment decision occurred; and (3) there was a causal connection between the protected act and adverse employment decision." *Williams v. Nashville Network,* 132 F.3d 1123 (6th Cir.1997) (citing *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir.1997)).[3] If a plaintiff establishes a *prima facie* case for retaliatory treatment, the burden then shifts to the defendant to show some nondiscriminatory reason for the action. *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988).[4] If the defendant meets its burden, then the plaintiff must produce direct, indirect, or circumstantial evidence that the defendant's treatment of the plaintiff was the result of a retaliatory motive. *Williams,* 132 F.3d at 1131; *Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1067 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

■ To establish the "causal link" required to prove retaliatory discharge, as specifically related to filing charges with the EEOC, a plaintiff "need only introduce evidence from which an inference can be drawn that he would not have been discharged had he not filed discrimination charges." *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 377 (6th Cir.1984), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3298, 92 L.Ed.2d 712 (1986). Plaintiff Dorricott provides such evidence by showing that the timing of Fairhill's decision to terminate her (November 26, 1996) occurred less than one month after she filed her claims with the EEOC and the OCRC (on or near November 7, 1996). Plaintiff Dorricott also gives evidence showing defendants' reasons for terminating her may be pretextual.

The correct inquiry in determining whether a defendant's reason is pretextual is to find out if the employer "in fact fired [the employee] for this reason." *Jackson,* supra at 378. Pretext is shown when the plaintiff establishes that the employer's proffered reason for the discharge simply is not worthy of belief. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Kline,* 128 F.3d at 342–343. Here, Plaintiff Dorricott gives the affidavit of Robert Skeist, the former associate director of the Fairhill Center for Aging. In his affidavit, Skeist states the following:

6. Prior to the commencement of the investigation of Denise Dorricott's allegations of sexual harassment, I was not aware of any serious complaints about her work performance. In fact, I had the opportunity to thank her for going "beyond the call of duty" in support of Fairhill staff, programs and service.

---

**3.** Title 29, U.S.C. § 215(a)(3) provides, in pertinent part:

It shall be unlawful for any person—

    *     *     *     *     *     *

(3) to discharge or in any other manner discriminate against an employee because such an employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify to any such proceedings, or has served or is about to serve on an industry committee . . . .

28 U.S.C. § 215(a)(3).

**4.** In *Wrenn,* the Sixth Circuit used the following four prong test to decide a claim for retaliation:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Id.* at 500.

7. After Denise Dorricott made her complaint of sexual harassment, I personally heard members of the senior staff of Fairhill, including Stephanie Fallcreek, make jokes about Denise. For example, it became a common joke concerning anything that couldn't be found or was done incorrectly to say "maybe Denise walked off with it," or "maybe Denise did it."

8. I do not believe the termination of Denise Dorricott was for just cause, but rather in retaliation for her complaint of sexual harassment.

9. I do not believe the investigation concerning Denise Dorricott's allegations of sexual harassment was conducted in a fair and impartial manner. In fact, it appeared as if the purpose of the investigation was to discredit Denise, rather than to uncover the truth concerning her allegations.

Affidavit of Robert Skeist, Plaintiff's Exhibit 2.

Upon review of this evidence, the Court concludes that material issues of fact are in dispute such to warrant consideration by a jury. These include the extent to which, if any, Plaintiff Dorricott was terminated "for cause" and the extent to which members of the Fairhill staff, if any, engaged in prohibited conduct as related to Plaintiff Dorricott's termination. Because such issues remain, the Court must deny the defendants' motion for judgment on Count III.

C. Tortious Interference with Contract

■ Defendants Fairhill next seek judgment on Dorricott's state claim for tortious interference with a contractual relationship. Count IV of Dorricott's complaint alleges that co-defendant Fallcreek, the Center's executive director, tortiously interfered with Plaintiff Dorricott's employment contract with the Center. Dorricott says that Fallcreek maliciously initiated investigations and breached confidences in retaliation for Dorricott's filing a complaint for sexual harassment against Tillman, who was also Fallcreek's brother-in-law.

In the instant case, Defendants also argue Dorricott fails to show how Fallcreek's conduct, if all, affected a "third party." Defendants Fairhill also argue that Dorricott's claim fails because she cannot show the existence of an employment contract. Defendants' memorandum at 18–19.[5]

■ The tort of inference business or a contractual relationship was first recognized by the Ohio Supreme Court in the case of *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 650 N.E.2d 863 (1995). There, the Supreme Court set forth the standards of proof necessary to make such a claim. A plaintiff must prove five elements: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) resulting damages. *Id.* at 419, 650 N.E.2d 863 (adopting the provisions of the Restatement of the Law 2d, Torts (1979)). It is clear from the Ohio Supreme Court's decision that the tort is to be used to redress the *intentional interference* with the performance of a contract by a *third person*. The court defines those that are subject to liability under the tort, as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Kenty*, 72 Ohio St.3d at 419, 650 N.E.2d 863 (quoting § 766, Restatement of Law 2d, Torts (1979)).

■ Tortious interference with contract requires an actor to improperly interfere with the performance of a contract between two other persons. See *Miller v. Wikel Mfg. Co., Inc.*, 46 Ohio St.3d 76, 79, 545 N.E.2d 76 (1989). An essential element of the tort is interference by someone who is not a party or agent of the party to the contract or relationship at issue. *Erebia v. Chrysler*

---

**5.** *See also* Defendants' motion to dismiss (citing *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 116 (6th Cir.1976); *Midland American Sales–*

*Weintraub, Inc. v. Osram Sylvania, Inc.*, 874 F.Supp. 164, 167 (N.D.Ohio 1995)).

*Plastic Products Corp.,* 891 F.2d 1212, 1216 (6th Cir.1989); *Condon v. Body, Vickers & Daniels,* 99 Ohio App.3d 12, 22, 649 N.E.2d 1259 (1994) (law firm office manager was not a "third party subject to liability for tortiously interfering with a contract to which the Firm was a party.").

■ Generally, a claim for tortious interference with a business or economic relationship requires proof that "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another is liable to the other for the harm caused thereby." *Brahim v. Ohio College of Podiatric Medicine,* 99 Ohio App.3d 479, 489, 651 N.E.2d 30 (1994).[6] Such actions must be intentional, because Ohio does not recognize negligent interference with a business relationship. See *Smith v. Ameriflora 1992, Inc.,* 96 Ohio App.3d 179, 186, 644 N.E.2d 1038 (1994); *Burnside v. Leimbach,* 71 Ohio App.3d 399, 404, 594 N.E.2d 60 (1991).[7]

■ A person is privileged to interfere in a contract, if the person is legitimately asserting a legally protected interest that the person believes will be impaired by the performance of the contract. *Emergency Preemption, Inc. v. Emergency Preemption Systems, Inc.,* No. 71350, 1997 WL 473093, *5 (Ohio App.8th Dist. Aug. 14, 1997). Officers, directors, and creditors of a corporation have a privilege to interfere with contracts in furtherance of their legitimate business interests. *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988).[8] However, corporate officers cannot interfere with a corporation's contract in his capacity as a corporate officer, yet may interfere if his acts were solely in his personal capacity.[9]

Therefore, for Plaintiff Dorricott to prevail on a claim for tortious interference with contract, she must show that Defendant Fallcreek, outside her capacity as the executive director of the Center, intentionally interfered with Dorricott's employment contract with Fairhill. The Court finds that Plaintiff Dorricott fails to give sufficient evidence showing that this occurred.

**6.** See also *A&B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283 (1995); *Ashcroft v. Mt. Sinai Medical Ctr.,* 68 Ohio App.3d 359, 365, 588 N.E.2d 280(1990) (quoting *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235 (1977)).

**7.** In *Anderson v. Minter,* 32 Ohio St.2d 207, 291 N.E.2d 457 (1972), the Ohio Supreme Court found that no cause of action will lie for an employee's claim that her supervisor interfered with her employment where "the act complained of is within the scope of a defendant's duties." *Id.* at 213, 291 N.E.2d 457. See also *Hill v. Gatz,* 63 Ohio App.2d 170, 410 N.E.2d 1268 (1979) (stating that "in the instant matter, appellees ... held supervisory positions .... Their statements were made within the scope of their duties. Therefore, appellant has failed to state a claim upon which relief can be granted"); *Rayel v. Wackenhut Corp., et al.* (June 8, 1995), Cuyahoga App. No. 67459, 1995 WL 350077, (Ohio App.8th Dist.1995) unreported at 14 (quoting *Everhart v. Francioli* [April 29, 1993], Cuyahoga App. No. 62377, 1993 WL 135823, (Ohio App.8th Dist. 1993) unreported at 15). ("[T]his court has unequivocally stated that, 'a supervisor of an employee cannot be held liable for tortious interference with contract....' As such, appellant's claim involved a suit by a subordinate employee against a supervisor. Under the law of this district, no such action can lie.").

**8.** See also *Bell v. Le–Ge, Inc.,* 20 Ohio App.3d 127, 485 N.E.2d 282 (1985); *Pearse v. McDonald's Systems of Ohio, Inc.,* 47 Ohio App.2d 20, 351 N.E.2d 788 (1975); *Johnson v. Lakewood Hospital,* Nos. 70943, 71257, 1997 WL 547968, *8–9 (Ohio App.8th Dist. Sept. 4, 1997).

**9.** It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation. *Kolb v. State of Ohio, Dept. of Mental Retardation and Developmental Disabilities,* 721 F.Supp. 885, 892 (N.D.Ohio 1989); *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1145 (4th Cir.1975) (quoting *Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 408 (10th Cir.1958)).

Defendants Fairhill also argue that Plaintiff Dorricott fails to satisfy the first element required to establish the tort—the existence of an employment contract. Here, the defendants argue that the relationship between Plaintiff Dorricott and the Fairhill Center is "employment-at-will" rather than contractual. The Court agrees.

■ In *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985) the Ohio Supreme Court determined that with little exception, employment relationships are presumed to be "at-will" unless the parties have specifically agreed otherwise. *Id.* The Court described this relationship as follows:

> Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages. The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week, or month. Although not absolute, the above stated rule appears to be in the nature of a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other. The presumption is grounded on a policy that it would otherwise be unreasonable for a man to bind himself permanently to a position, thus eliminating the possibility of later improving that position. Moreover, a contract of permanent employment is by its very nature indefinite, and thus any effort to interpret the duration of the contract and assess the amount of damages becomes difficult.[10]

The Court in *Mers* further stated that "[u]nless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason which is not contrary to law. This doctrine has been repeatedly followed by most jurisdictions, including Ohio, which has long recognized the right of employers to discharge employees at will."[11]

The employment relationship between Plaintiff Dorricott and the Fairhill Center for aging was an at-will arrangement. This is confirmed by the letter from Fallcreek to Dorricott, dated June 5, 1996, offering her a job with the Center. In the letter, it clearly states that "a six (6) month introductory period is in effect for all new employees in order to determine a satisfactory level of performance and appropriate match." Defendants' Exhibit B, ¶ 2. The letter further states "[a] performance evaluation will occur after approximately one (1) year of service and at least annually thereafter." These provisions clearly imply that Plaintiff Dorricott's continued employment with the Center is subject to her satisfactory performance of job responsibilities. Should Dorricott's performance fall below satisfactory levels, it can be inferred that her job would be at risk. See *Taylor v. National Group of Companies, Inc.*, 729 F.Supp. 575, (N.D.Ohio 1989) (stating that an employee handbook containing an express disclaimer indicating that the handbook itself does not create a contractual relationship does not establish an implied contract of employment).

Because Plaintiff Dorricott fails to show a contractual relationship with the Center, and because she fails to give sufficient evidence that Fallcreek, outside the scope of her employment, intentionally engaged in conduct interfering with Dorricott's relationship with the Center, the Court grants defendants' motion for summary judgment on Count IV.

### D. Wrongful Discharge

■ Defendants Fairhill next say Dorricott's claim for "wrongful discharge" fails because, as originally pled, no such claim

---

10. *Mers*, 19 Ohio St.3d at 102, n. 1, 483 N.E.2d 150 (quoting *Henkel v. Educational Research Council*, 45 Ohio St.2d 249, 255, 344 N.E.2d 118 (1976)).

11. *Mers*, 19 Ohio St.3d at 103, 483 N.E.2d 150 (citing as examples *Evely v. Carlon Co.*, 4 Ohio St.3d 163, 447 N.E.2d 1290 (1983); *Fawcett v. G.C. Murphy & Co.*, 46 Ohio St.2d 245, 348 N.E.2d 144 (1976); *Henkel v. Educational Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976); *La France Elec. Const. & Supp. Co. v. International Broth. of Elec. Workers*, 108 Ohio St. 61, 140 N.E. 899 (1923)).

exists under Ohio law. Here, defendants attack the form and manner Plaintiff Dorricott stated her claim for wrongful discharge. The defendants argue that absent stating a particular reason "why" her termination was wrongful (such as being "against public policy"), no claim can lie. Defendants' reply memorandum at 10.

Defendants Fairhill correctly point out that a complaining party should state why they were wrongfully discharged. The defendants also correctly state that as pled, this claim fails to fully identify the basis of Dorricott's claim. However, in light of the Plaintiff Dorricott's proposal to amend her claim under Count VI, the Court finds Dorricott's failure to reference such public policy basis to be forgivable error.

Upon review of Plaintiff Dorricott's proposed amended claim, the Court finds that Dorricott sufficiently clarifies her claim for wrongful discharge to include violations of public policy. These allegations include: (a) sexual harassment, (b) retaliation against persons who make complaints of sexual harassment, and (c) termination of persons who require medical leave as a result of sexual harassment and retaliation. Because Dorricott's amendment of the complaint in this manner is reasonable and non-prejudicial, the Court grants Plaintiff leave to amend her complaint to this extent.

Having determined that Plaintiff Dorricott has properly pled a claim for wrongful discharge, the Court turns to whether the claim survives summary judgment.

■ The State of Ohio has only recently come to recognize a separate, actionable tort claim for "wrongful discharge." The evolving law of public policy torts in Ohio was most recently clarified by the Ohio Supreme Court in *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). There, the court held that an employee discharged for filing a complaint with OSHA may maintain a separate tort action for violation of public policy despite the fact that the plaintiff failed to comply with the Ohio Whistleblower Act. *Id.* at 162, 677 N.E.2d 308. See also *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d 228, 233–34, 551 N.E.2d 981 (1990) (stating that "the time has come for Ohio to join the great number of states which recognize a policy exception to the employment-at-will doctrine.").[12] Notably, the tort is only used as an exception to the doctrine of employment-at-will where there exist egregious violations of public policy. *Painter v. Graley,* 70 Ohio St.3d 377, 384, 639 N.E.2d 51 (1994).[13]

---

**12.** To make out a claim for wrongful discharge in violation of public policy, a plaintiff must demonstrate the following: (1) that [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). *Kulch,* 78 Ohio St.3d at 151, 677 N.E.2d 308.

In *Kulch,* the Ohio Supreme Court adopts the test set forth by Villanova Law Professor H. Perritt, in his article THE FUTURE OF WRONGFUL DISMISSAL CLAIMS: WHERE DOES EMPLOYER SELF INTEREST LIE? 58 U. Cin. L.Rev. 397, 398–399 (1989). *See also Collins v. Rizkana,* 73 Ohio St.3d 65, 69–74, 652 N.E.2d 653 (1995), *recon'd. denied,* 74 Ohio St.3d 1409, 655 N.E.2d 188 (1995) (determining that, in Ohio, a cause of action may be brought for the tort of wrongful discharge in

violation of public policy based on sexual harassment/discrimination in the workplace).

**13.** In *Painter,* the Supreme Court of Ohio effectively overruled *Tulloh v. Goodyear Atomic Corp.,* 62 Ohio St.3d 541, 584 N.E.2d 729 (1992) by stating:

[A]n exception to the employment-at-will doctrine is justified where an employer has discharged his employee in contravention of a "sufficiently clear public policy." The existence of such a public policy may be discerned by the Ohio judiciary based on sources such as the Constitutions of Ohio and the United States, legislation, administrative rules and regulations, and the common law.

The Court further stated that recognizing an exception to the "traditional doctrine of employment-at-will should be recognized only where public policy alleged to have been violated is of equally serious import as the violation of a statute." The Court went on to state that "[f]ull development of the elements of the tort of wrongful discharge in violation of public policy in Ohio will result through litigation and resolution of future cases...." *Id.* at 384, 639 N.E.2d 51.

In the instant case, Defendants Fairhill argue that Dorricott's claim for wrongful discharge violating public policy fails "absent sustaining a claim for either sexual harassment of retaliation." Defendants also say this claims fails because Plaintiff Dorricott neglects to give any evidence regarding the "public policy against terminating employees who take leave." Defendants' reply memorandum at 10.

This Court has previously addressed the viability of a public policy tort claim where a plaintiff is provided relief through other remedial schemes. See *Vargo Adams v. U.S. Postal Service*, 992 F.Supp. 939, 943–45 (N.D.Ohio 1998) (dismissing public policy tort where family medical leave claim was governed by federal statute); *Gall v. Quaker City Castings*, 874 F.Supp. 161 (N.D.Ohio 1995). In *Gall*, the Court stated:

> Congress has obviously spoken on the issue of … family medical leave in the workplace by enacting comprehensive statutes as legislative statements of public policy in this area. As the *Painter* Court noted, "Judicial policy preferences may not be used to override valid legislative enactments, for the [legislature] should be the final arbiter of public policy." Because the legislature has enunciated public policy and provided remedial schemes to protect employees in this area, this Court will not override the scheme ….

*Id.* at 164.[14] Here, because Plaintiff Dorricott has available a remedial scheme based upon federal and state statutes governing retaliatory discharge, the Court finds that Plaintiff Dorricott's independent tort claim for wrongful discharge in violation of public policy must fail. Accordingly, the Court grants defendants' motion for judgment on Dorricott's wrongful discharge claim in Count VI.

**E. Defamation**

Defendants Fairhill lastly say they are entitled to judgment on the plaintiff's claim for defamation under Count VII. The defendants argue this claim fails because any statements made by Defendants Fairhill to the Ohio Bureau of Employment Services ("OBES") were subject to qualified privilege. Specifically, Defendants Fairhill say no cause of action for defamation arises since the Center "had a duty to provide information to the Ohio Bureau of Employment Services." Defendants' memorandum at 17–18 (citing for support, *Matthias v. Wendy's of Pearl, Inc.*, No. 71721, 1997 WL 578918, 1997 LEXIS 4227 (Ohio App. Sept. 18, 1997); *Pandi v. Marc Glassman, Inc.*, No. 68076, 1995 WL 277109, 1997 LEXIS 1966 (Ohio App. May 11, 1995)).

To establish a claim for defamation in Ohio, the complaining party shoulders the burden of proving by clear and convincing evidence that the defendant made a false, defamatory statement of fact regarding the complaining party and that the defendant was at least negligent in publishing it. *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 178–180, 512 N.E.2d 979 (1987). The essential elements required to make a defamation claim are: (1) falsity, (2) publication, (3) defamation, (4) fault, and (5) injury.[15] A claim for defamation requires specific and personalized liability. The actor must be identifiable, either individually, or as a class. The Supreme Court of Ohio has stated that a complaining party must establish "a publication to a third person for which the defendant is responsible." *Hahn v. Kotten*, 43 Ohio St.2d 237, 331 N.E.2d 713 (1975).

In the instant case, Plaintiff Dorricott argues Defendants Fairhill, in bad faith, provided copies of memoranda containing false allegations about her job performance and the reasons for her discharge to the OBES.

**14.** *See also Wyckoff v. Forest City Auto Parts*, 916 F.Supp. 683 (N.D.Ohio 1996) (dismissing common law public policy tort claim where statutory discrimination statutes provide avenues for relief); *Napier v. VGC Corp.*, 797 F.Supp. 602 (S.D.Ohio 1992) (finding no exception to employment-at-will for age discrimination (where legislature has already provided a remedy through Ohio Rev.Code § 4112.02(N))).

**15.** A defamatory communication is a publication that tends to harm the reputation of another. The reputation of another is harmed when the publication lowers the community's estimation of that person or when it deters third parties from associating or dealing with that person. *North Coast Cable L.P. v. Hanneman*, 98 Ohio App.3d 434, 442, 648 N.E.2d 875 (1994).

Dorricott does not say who transmitted the correspondence or how, if at all, she was damaged. The defendants say these communications with OBES were relevant to Dorricott's termination from Fairhill and her eligibility for unemployment compensation. Dorricott maintains that Fairhill's actions exceed the scope of the privilege.

The defense of qualified privilege as related to statements made to the OBES was discussed in *Taylor v. National Group of Companies,* 729 F.Supp. 575, 578 (N.D.Ohio 1989). There, the district court found that although the Ohio Supreme Court had not specifically addressed the issue of whether statements made to the OBES were subject to qualified privilege, the court felt that such communications would be protected. The district court stated:

> The Court is persuaded that, faced with the issue, the Ohio Supreme Court would recognize at least a qualified privilege for communications to the Bureau of Employment Services in light of the weight of authority on the issue in other jurisdictions. Similarly, statements made in good faith in a matter of common interest between an employer and an employee or between two employees regarding a third employee are subject to qualified privilege.

*Id.* (citing *Stearns v. Ohio Savings Assoc.,* 15 Ohio App.3d 18, 472 N.E.2d 372 (1984)).

Since *Taylor,* the Ohio Supreme Court has addressed the issue of qualified privilege at great length. *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 7, 651 N.E.2d 1283 (1995). In *A & B–Abell,* the Ohio Supreme Court stated that a qualified privilege can arise to protect a party from defamation suits "where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person ... in the performance of such duty ...." *Id.* 8, 651 N.E.2d 1283. The court further held that statements made in "good faith on any subject matter in which the person communicating had an interest," were covered by the privilege. *Id.* The court went on to say:

> [t]he defense of qualified privilege is deeply rooted in public policy. It applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection. Accordingly, the privilege does not attach to the communication, but to the occasion on which it is made.

*Id.* 8–9, 651 N.E.2d 1283.

Upon review of the record, the Court does not find that Plaintiff Dorricott has given sufficient evidence to show that Defendants Fairhill "maliciously" published false statements to the OBES. In Ohio, "a qualified privilege can be defeated only by a clear and convincing showing that the communication was made with actual malice." *Id.* at 11, 651 N.E.2d 1283 (citing *Jacobs v. Frank,* 60 Ohio St.3d 111, 114, 573 N.E.2d 609 (1991)). Therefore, the "lack of an innocent motive on the part of the defendant is insufficient to defeat the privilege." *Id.*

Because Plaintiff Dorricott fails to sufficiently show Defendants Fairhill acted with the requisite malice under Ohio law to defeat the defense of qualified privilege, and because she fails to give evidence she was damaged, if at all, by the defendants' transmitting information to the OBES, the Court grants defendants' motion for summary judgment on Count VII of the complaint.

## IV. Conclusion

For the reasons set forth above, Fairhill's motion for summary judgment is granted as to Dorricott's claims for sexual harassment and gender discrimination under federal and state law (Counts I and II), tortious interference with contract (Count IV), wrongful discharge (Count VI) and defamation (Count VII); and is denied as to Dorricott's remaining claim for retaliation (Count III).

IT IS SO ORDERED.